[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11239

_____

D.C. Docket No. 6:18-cr-00190-CEM-TBS-1


UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KENEON FITZROY ISAAC,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(February 5, 2021)

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

ED CARNES, Circuit Judge:

One winter day, a mother and her two young daughters were begging for

money at a convenience store.  The mother was ill and they were homeless,

hungry, destitute. A man approached them and offered to help. He bought them food and clothing, found them a place to stay, even purchased watches for them. When you're desperate, those showing kindness can seem heaven-sent and those who help can appear angelic. But not every kind act is motivated by kindness and some who offer help aim to harm. Keneon Fitzroy Isaac is an example, which is why he is now serving an 80-year sentence in federal prison.

## I.  BACKGROUND

In the weeks after meeting the mother and her two daughters at the convenience store in January of 2018, Isaac regularly provided them with food and clothing, even gifts. At first he paid for hotel rooms for them. Eventually, he provided them with an RV to live in. It didn't have plumbing or electricity, but it was better than living on the streets. By those acts of kindness, Isaac gained their trust. Which was exactly what he wanted to do.

Within a month of meeting the family, Issac, who was 44 years old, began sexually abusing D.J., the 13-year-old daughter. On two separate occasions, he recorded himself abusing her, the first time in photographs and the second in both photographs and videos. On February 22, 2018, he picked D.J. up in his Mercedes-Benz. While Isaac had the homeless 13-year-old girl alone in his car, he "persuaded and directed [her] to pull down her underwear and display her naked vagina" and he used his LG cellphone to take pictures of her exposed vagina.

2

A couple of days later, Isaac sexually abused the young girl again. This time he took her to his condominium. Alone with her there, Isaac performed oral sex on the child and had her perform oral sex on him, while recording two videos of his sexual abuse. He took still pictures of her lying on his bed with her vagina displayed and in other poses. He took a lot of pornographic pictures of D.J. that day — 366 of them.

Less than a month later, after an investigation sparked by an anonymous tip, officers from the Cocoa Beach, Florida Police Department arrested Isaac. They seized a ZTE cellphone Isaac had on him when he was arrested. The officers also conducted an inventory search of Isaac's car and found a second cellphone, a black LG. Later, they got warrants to search both cellphones.

Their search of Isaac's LG cellphone revealed the pictures and videos that he had taken of himself sexually abusing D.J. But that was not all. On one of his cellphones, Isaac had downloaded from the internet 213 images of child pornography, and on his other cellphone he had downloaded 30 images. (It is not clear, and doesn't matter to any of the issues, how many of the 30 images on the second cellphone were duplicates of images on the first phone.) Several of those images came from various "series" that had been widely distributed on the internet. Some of them showed the sexual abuse of prepubescent children. And toddlers. And even infants.

3

Some of those pornographic pictures of prepubescent children and toddlers and infants showed them being bound or sexually tortured. For example, one of the child pornography pictures that Isaac had downloaded showed a little girl between 7 and 9 years old, "lying naked on a bed with a yellow rope wrapped around her right leg pulling her legs apart and exposing her vagina." Another showed a different little girl between 7 and 9 years old performing oral sex on an adult male's erect penis; she had duct tape around her right ankle, and a roll of duct tape was next to the child. Another showed an adult male penetrating a naked infant with a baby bottle.

## II. PROCEDURAL HISTORY

A federal grand jury returned a three-count indictment against Isaac. It charged him with two counts of producing child pornography, in violation of 18 U.S.C. § 2251(a) and (e), and one count of possessing child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B) and (b)(2).

### A. Motion to Suppress

Isaac moved to suppress the evidence found on his LG cellphone, which was the one that was found in his car. That phone contained the videos and pictures of Isaac sexually abusing D.J. and 213 other child pornography pictures. He argued that the warrant authorizing the search of that cellphone was invalid because the search of his car was an illegal search incident to arrest. In response to the

4

government's argument that the search was instead a routine inventory search, he argued that it was not a valid one because the officers had failed to comply with their department's own procedures because they did not give him a chance to have somebody come and get his car as an alternative to it being impounded. The government replied that the inventory search was authorized by and done in compliance with standard police procedures. At the suppression hearing the arresting officer, Detective Betts of the Cocoa Beach Police Department, testified about his investigation, the arrest of Isaac, and his search of Isaac's Mercedes-Benz.

Betts recounted how he had begun investigating Isaac after the Cocoa Beach Police Department received an anonymous tip. The tip was that a man named "Keneon Isaac" had paid for a motel room for a mother and her two children, that he was "having intercourse" with one of those children, and that there was "possibly evidence" of the sexual abuse on a cellphone.

Having been given Isaac's name, Betts was able to locate and meet with him. Isaac confirmed that he had met the family while they were begging for money, and said he felt sorry for them and was helping them out. He described the two children and gave Betts their names. He also gave Betts a phone number that he said was for the mother, but Betts was unable to locate the family.

5

About a month later the tipster came forward, identified herself as a friend of Isaac's girlfriend, and said she now had proof of the abuse. She told Detective Betts that Isaac's girlfriend had sent her pictures of "sex acts between a juvenile female and an African-American male." The tipster showed Betts pictures of those pictures, which had been taken by using one phone's camera to photograph pictures displayed on a different phone's screen. The phone that had been photographed, which is the one the child pornography was on, was a black phone with a cracked touchscreen.

The tipster also gave Betts information about where to find the family. He later found the children in an RV behind a rundown gas station in a high crime area. That night from about 7:00 p.m. until 10:30 p.m. he interviewed D.J. and her sister at the sheriff's office.

D.J. told Detective Betts how she had met Isaac and how he had provided for her and her family. She also told Betts that she had engaged in oral sex acts with Isaac and that Isaac had recorded and taken pictures of those acts. She said Isaac had a ZTE cellphone, and she gave Betts the number for it.

Based on his interviews of D.J. and her sister, Detective Betts decided he had probable cause to arrest Isaac for lewd and lascivious battery. He went to the RV and called Isaac and asked him to come there. Isaac arrived alone in his Mercedes-Benz at around 11:00 p.m. He parked in a nearby lot, blocking a semi-

truck that was also parked there. After Isaac walked up to him, Betts called the number D.J. had given him; and the phone Isaac had on him began to ring. From that, Betts concluded the phone was the same one that D.J. had described, but he couldn't tell if its screen was cracked, and he didn't know whether Isaac had any other cellphones on him or in his car.

Betts and the other officers on the scene arrested Isaac. After a search incident to arrest, the officers seized the cellphone Isaac had on him, which was the ZTE cellphone. And with Isaac in police custody, Betts had to decide what to do with Isaac's Mercedes-Benz.

Detective Betts decided to have the car impounded. He later testified that the Cocoa Beach Police Department's Standard Operating Procedure authorized him to impound Isaac's car because Isaac was in custody. Betts made the decision to do it for several reasons: it was late at night and the Mercedes-Benz would be unsecured in a high crime area; the police department was short staffed, so there were no officers who could remain with it; Betts himself could not stay with the car because he needed to interview Isaac; Isaac's car was blocking a parked semi-truck whose driver had shown up and said that he needed to leave; and Isaac was alone and, although he had a roommate, the roommate had a suspended license and could not move the car for him.

Because the car would be impounded, Detective Betts said he was required by the Standard Operating Procedure to conduct an inventory search. An inventory search is standard procedure of the police department if a car will be towed, Betts testified, "[t]o preserve any valuables that might be in the car" and "to notate what's inside" so that the city "is not liable for anything missing or damaged." For that reason, officers doing an inventory search are required to complete a "property report form." The Standard Operating Procedure also says officers are supposed to do the search before the car is towed and that any property found in the car should be left in it.

Following the procedure for inventory searches, Betts and another officer searched the car. They found a black touchscreen cellphone with cracks in the screen — Isaac's LG cellphone. Betts recognized the phone from the tipster's pictures, so he decided to leave it in the car and get a warrant to search the car and seize the phone. He then completed the inventory search, left Isaac's phone where he found it, and the car was towed.

The next day Detective Betts got a search warrant for the car authorizing him to seize the phone. And then he got warrants to search the contents of both of Isaac's cellphones — the ZTE cellphone found on Isaac's person and the LG cellphone found in his car.

8

The district court denied Isaac's motion to suppress the evidence from his LG cellphone. It rejected Isaac's argument that the search of the car was a search incident to arrest. Instead, it found the search of the car was an inventory search, and that it was valid. The court implicitly credited Betts' testimony by adopting his version of events and concluded that all of his actions related to the search "took place using his reasonable discretion according to standard police procedure and in good faith." Because the inventory search was lawful, the court concluded, the later search warrants obtained for the car and the contents of the LG cellphone were also lawful, and "suppression of the cellphone and any evidence discovered from the cellphone [was] not warranted."

## B. Bench Trial

After his suppression motion was denied, Isaac consented to a bench trial based on stipulated facts. Those stipulated facts included that: Isaac had gained the family's trust by providing them living necessities; he had engaged in sexually explicit conduct with D.J. in his car and documented that conduct in photographs; he had engaged in sexually explicit conduct with D.J. in his condo and documented that conduct in photographs and video recordings; and his cellphones had contained hundreds of additional pictures of child pornography involving other children. Isaac and the government "agree[d] that the stipulated facts are true and

9

correct and that they prove the elements of Counts One, Two and Three of the Indictment beyond a reasonable doubt."

(Isaac's brief to this Court refers to D.J. as his "alleged victim." It is not merely an allegation. Isaac stipulated to the fact that he had engaged in sexually explicit conduct with D.J. and had taken hundreds of photographs and two videos of it. He "agree[d] that the stipulated facts are true and correct." His sexual abuse of D.J. is not an allegation. It is a fact.)

After a bench trial based on the stipulated facts, the district court found Isaac guilty on all counts.

## C. Sentencing

Isaac's presentence investigation report calculated an advisory guidelines range of life in prison. The combined statutory maximum for his crimes, however, was 960 months, so that became the top and bottom of his recommended guideline range. See 18 U.S.C. §§ 2251(e), 2252A(b)(2); United States Sentencing Guidelines § 5G1.1(a) (Nov. 2018); United States v. Irey, 612 F.3d 1160, 1169–70 (11th Cir. 2010) (en banc). The recommended range was based on a total offense level of 43 and a criminal history category of I.

The PSR recommended a base offense level of 32. To that base offense level, the PSR recommended five enhancements: two levels because the victim was a minor between the ages of 12 and 16, U.S.S.G. § 2G2.1(b)(1)(B); two levels

because the offense involved the commission of a sexual act or sexual contact, id. § 2G2.1(b)(2)(A); two levels because the victim was a minor in Isaac's custody, care, or supervisory control, id. § 2G2.1(b)(5); two levels because Isaac knew or should have known the victim was a vulnerable victim, id. § 3A1.1(b)(1); and five levels because Isaac had engaged in a pattern of activity involving prohibited sexual conduct, id. § 4B1.5(b)(1). It recommended increasing Isaac's offense level by another three levels based on grouping his convictions under U.S.S.G. § 3D1.4. That three-level increase based on grouping was calculated, in part, by applying an enhancement within one of the underlying groups: an enhancement under U.S.S.G. § 2G2.2(b)(5) for engaging "in a pattern of activity involving the sexual abuse or exploitation of a minor." The PSR also recommended a two-level reduction for acceptance of responsibility. See id. § 3E1.1(a). The net effect of the recommended enhancements and reduction would have been an offense level of 46. But when a total enhanced offense level is greater than 43, the guidelines require that the total offense level still be treated as 43. See id. ch. 5, pt. A, cmt. n.2.

Isaac objected to some of the recommended adjustments, and he continues to challenge three of them in this appeal. He objected to the two-level enhancement under U.S.S.G. § 2G2.1(b)(5), arguing that D.J. was not in his custody, care, or supervisory control. He objected to the five-level increase under U.S.S.G.

11

§ 4B1.5(b)(1), arguing that his conduct did not establish a pattern. And, on the same grounds, he objected to the increase under U.S.S.G. § 2G2.2(b)(5) for engaging in a pattern of activity involving the sexual abuse or exploitation of a minor.

At the sentence hearing, the district court overruled Isaac's objections and adopted the PSR. Among other things, the court found that D.J. was under Isaac's "custody, care, or supervisory control" because of the "significant disparity" between their ages, and because Isaac was able to get D.J. alone as a result of "the trust he had earned from the family." The court based those findings on the evidence and the stipulated facts. The court also found that Isaac had engaged in a "pattern of activity" because a "plain reading" of the guidelines and the stipulated facts showed that he had sexually abused D.J. on two separate occasions, which was enough to be a pattern under the relevant guideline provisions.

The court then heard from Isaac, who began by stating that he was a "regular person." He said that he "first and foremost" thanked the court for "treating [him] like a human being" and commented that these criminal proceedings had "been extremely devastating on [him], on [his] life." He disavowed any excuse for his behavior because he was "raised in a good Christian home with great parents." He had disgraced his parents, he said, and "this [was] the worst thing [he] could bring before them."

12

Isaac told the court he took "full responsibility" for his actions. But at the same time he downplayed the seriousness of his actions, asserting "[i]t's not something that I stalked the family or sat in a place and waited for somebody to appear." Instead, he told the court, "[i]t was just a bad judgment on my part."

After hearing argument and taking a brief recess, the court discussed the factors it had considered in determining Isaac's sentence. The court noted it "was a bit taken aback" by Isaac's statement about his "bad judgment" because that statement didn't match the "unthinkable heinous behavior" he had admitted. Instead, what Isaac said was "the kind of statement [the court] expect[ed] to hear from someone who's been caught shoplifting or writing a bad check." Isaac's crimes were not just "misjudgment on [his] part" but a "definite pattern" where he "expertly groomed this child for what was coming." He "had all of the tools in [his] toolbox to get from point A to point B," and it "was very calculated, very systematic, and very dangerous." Isaac "couldn't [have done] a more textbook version of grooming." The mismatch between Isaac's crimes and his statement to the court suggested to it that Isaac did "not understand the enormity" of what he'd done, or that he was "not really sorry for what [he'd] done."

The court also noted the impact of the crime on the 13-year-old D.J., saying she "has already gotten a life sentence." The court explained the difficulties D.J. may have to endure throughout her life:

[Y]ou should know that for the rest of her life, whenever she meets someone, if she decides to marry someone, if she decides to have kids one day, for every part of her life moving forward, she's going to think about this. Do I tell anyone about what happened to me? Are they going to blame me for what happened? Is she going to use some sort of controlled substance to try to manage the horrible posttraumatic stress disorder that she is probably suffering based on what happened? This never goes away.

The court explained to Isaac that even though it was not the only consideration in sentencing, the "impacts on victims are a big part of what we do here, because we don't want victims to become vigilantes and take matters into their own hands." And, the court said, the victim "receiving a life sentence is something that weigh[ed] heavily on [it]."

The court emphasized the seriousness of Isaac's "unthinkable heinous conduct" and said that "I don't think it gets much worse than this." And the court described Isaac's crimes as "sort of the un-Holy Trinity. [He] took advantage of a family by earning their trust. Then [he] sexually abused, sexually battered a child. And on top that, [he] filmed it." The court also noted that because the sexual abuse was recorded there is the possibility that the recordings might "pop up later."

The court sentenced Isaac to the statutory maximum sentence, which was also the top and bottom of his guideline range. That sentence was a term of 960 months in prison: 360 months for Count One, 360 months for Count Two, and 240 months for Count Three, all to run consecutively. The court found that, after considering the advisory sentencing guidelines and the 18 U.S.C. § 3553(a) factors,

14

the sentence was sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing.

## III.  INVENTORY SEARCH ISSUE

Isaac contends that the district court erred in denying his motion to suppress the evidence found on his LG cellphone.  He argues that the cellphone was found because of an illegal inventory search of his car, so it should have been suppressed as the fruit of an illegal search.  According to him, the search was illegal because Detective Betts, the officer who decided to impound his car, failed to follow the police department's procedures.

We review a district court's ruling on a motion to suppress under a mixed standard, reviewing only for clear error the district court's findings of fact and reviewing de novo its application of the law to those facts.  United States v. Bervaldi, 226 F.3d 1256, 1262 (11th Cir. 2000).  "[W]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below."  Id.  Here, that's the government.

Though the police generally need a warrant to conduct a search, they do not need a warrant to search an impounded car if they (1) had the authority to impound the car, and (2) followed department procedures governing inventory searches. See United States v. Williams, 936 F.2d 1243, 1248 (11th Cir. 1991).  An officer has the authority to impound a car if his decision to impound it is "in good faith,

15

based upon standard criteria, and not solely based upon suspicion of evidence of criminal activity." Sammons v. Taylor, 967 F.2d 1533, 1543 (11th Cir. 1992) (quotation marks omitted); accord United States v. Johnson, 777 F.3d 1270, 1277 (11th Cir. 2015). Though the search cannot be based on only the suspicion of finding evidence, an officer's expectation that evidence will turn up does not invalidate an otherwise lawful inventory search. See United States v. Bosby, 675 F.2d 1174, 1179 (11th Cir. 1982). Once a car is lawfully impounded, officers may conduct a warrantless inventory search of it if they continue to follow "standardized criteria." Sammons, 967 F.2d at 1543.

The district court found that the police department's Standard Operating Procedure ("SOP") authorized Betts to impound Isaac's car. That procedure gives Cocoa Beach police officers the authority to impound cars in at least 10 different situations. The district court decided that this case involved one of those impoundment situations, the one in which the driver is taken into custody and the car would be left unattended. In that situation, the officer may impound the car if "all reasonable efforts to provide the vehicle driver with alternatives to impoundment have been unsuccessful or impractical due to time or staffing constraint." We will call this the post-arrest provision.[1]

---

[1] Isaac argues that another of the provisions in the SOP also applied. That provision regulates situations where a "parked/abandoned" car is on private property. At the time of the inventory search in this case, that provision said that when a car is "parked/abandoned on private

16

As for the inventory search following impoundment, the court also pointed to the part of the SOP requiring that "[a]ll vehicles impounded or seized by the Cocoa Beach Police Department <u>must be searched and inventoried</u>." (Emphasis added.) And providing that "[w]henever possible" the inventory search "will be conducted prior to the vehicle being removed from the scene." Property found and inventoried during the search will, the procedures require, remain with the car "[w]henever practical," and the searching officer will prepare a property receipt, which will be given to the arrestee.

The district court did not err in finding that Betts had the authority to impound Isaac's car. The SOP's criteria for impoundment and inventory searches of cars were enough to authorize impoundment. <u>See</u> <u>Sammons</u>, 967 F.2d at 1543. Those criteria fit the situation Betts was in after he arrested Isaac that night. Based on Betts' testimony, the district court found that he "reasonably determined" that alternatives to impoundment were impractical.

Isaac contends that even if impoundment might otherwise have been proper, it was improper in this instance because Betts failed to follow the SOP in at least one respect. It requires that, before the car is impounded, "all reasonable efforts to

property, . . . [t]he officer should inform the owner/agent that he/she may have the vehicle towed." Regardless of what that provision says about parked and abandoned cars, nothing in the SOP suggests that Betts had to meet the requirements of that provision, instead of the one applicable to post-arrest situations, or that he had to meet the requirements of both of those provisions. The post-arrest provision authorized Betts to impound Isaac's car, as he did.

17

provide the vehicle driver with alternatives to impoundment have been unsuccessful or impractical due to time or staffing constraint." Isaac asserts that Betts did not try one alternative, which was letting Isaac call someone to come and get the car.

Isaac does not contend that he asked Detective Betts to let him do that, nor is there any evidence someone was available to come and get the car at that late hour. In any event, Betts testified that he needed to interview Isaac that night, which would have prevented him from waiting with the car until some unidentified person could be contacted, could find a way there, and could drive Isaac's car away. Betts also testified that the Cocoa Beach Police Department is small, that it was short staffed that night, and that one of the other officers on the scene had to leave. Not only that, but Isaac's car was blocking a semi-truck that needed to be freed from the informal blockade. The driver of that truck wanted to leave because he needed to make a delivery. For these reasons, the district court's finding that Isaac's proposed alternative was, in the language of the procedures, "impractical due to time or staffing constraint," was not clear error.

Nor was it clear error, or any error at all, for the district court to find that Betts properly followed procedures when he conducted the inventory search. The SOP stated that any inventory search should be done before the car was towed, as it was. It stated that property in the car should be left in the car, as it was. It also

18

stated that the inventoried items should be logged on a property report, as they were.  Isaac does not contend otherwise.

The district court found that Betts' actions all "took place using his reasonable discretion according to standard police procedure and in good faith." That finding was not clear error.  The evidence presented at the hearing supports the finding that Betts followed the SOP to the letter.  The district court properly denied Isaac's motion to suppress.

## IV.    SENTENCE ISSUES

Isaac contends that his sentence was procedurally unreasonable because the district court erred in applying three of the enhancements it did in calculating his guidelines range: the ones under U.S.S.G. §§ 2G2.1(b)(5), 2G2.2(b)(5), and 4B1.5(b)(1).  He also contends that his sentence was substantively unreasonable because the district court failed to properly consider the § 3553(a) factors.

When reviewing guidelines issues, we review legal questions de novo, factual findings for clear error, and the district court's application of the guidelines to the facts with due deference, which is "tantamount to clear error review." United States v. Rothenberg, 610 F.3d 621, 624 (11th Cir. 2010); see also United States v. Alfaro, 555 F.3d 496, 498–99 (5th Cir. 2009) (reviewing district court's factfinding and application of U.S.S.G. § 2G2.1(b)(5) for clear error).  "For a finding to be clearly erroneous, this Court must be left with a definite and firm

19

conviction that a mistake has been committed." Rothenberg, 610 F.3d at 624

(quotation marks omitted). To be procedurally reasonable, a defendant's

guidelines range, including the application of any enhancements, must have been

correctly calculated. See United States v. Gonzalez, 550 F.3d 1319, 1323 (11th

Cir. 2008). If the district court's sentence was procedurally reasonable, then we

consider whether it was substantively reasonable. Id. at 1323–24.

### A. The Custody, Care, or Supervisory Control Enhancement

A defendant convicted of producing child pornography is subject to a two-

level enhancement to his base offense level under U.S.S.G. § 2G2.1(b)(5) in either

of two situations. First, if the defendant "was a parent, relative, or legal guardian

of the minor involved in the offense." U.S.S.G. § 2G2.1(b)(5). Or second, "if the

minor was otherwise in the custody, care, or supervisory control of the defendant."

Id. The commentary explains that this two-level enhancement is "intended to have

broad application and includes offenses involving a minor entrusted to the

defendant, whether temporarily or permanently." Id. § 2G2.1 cmt. n.5(A). "For

example, teachers, day care providers, baby-sitters, or other temporary caretakers

are among those who would be subject" to the increase. Id. In deciding whether a

defendant qualifies, we are advised to "look to the actual relationship that existed

between the defendant and the minor and not simply to the legal status" of that

relationship. Id.

20

Isaac argues that this enhancement does not apply to him because the stipulated facts "do[] not assert" that D.J. was in his "custody, care, or supervisory control." The government argues that the age difference between Isaac and his victim, the fact that D.J.'s mother was ill, and the fact that Isaac gained the family's trust by providing them with basic living necessities all support application of the enhancement.

Our interpretation of the guidelines is governed by traditional rules of statutory construction, United States v. Lange, 862 F.3d 1290, 1294 (11th Cir. 2017), and the language of the guidelines is given its "plain and ordinary meaning," United States v. Tham, 118 F.3d 1501, 1506 (11th Cir. 1997). We follow a guideline's application note as "authoritative unless we determine that it 'is inconsistent with, or a plainly erroneous reading of, that guideline.'" United States v. Hill, 783 F.3d 842, 844 (11th Cir. 2015) (quoting Stinson v. United States, 508 U.S. 36, 38 (1993)).

The instruction in the commentary that courts should apply § 2G2.1(b)(5) broadly and functionally guides our analysis. See U.S.S.G. § 2G2.1 cmt. n.5(A). The language of the commentary is broadly inclusive, stating that the enhancement "includes offenses involving a minor entrusted to the defendant." Id. (emphasis added); see id. § 1B1.1 cmt. n.2 ("The term 'includes' is not exhaustive."); United States v. Newman, 614 F.3d 1232, 1236–37 (11th Cir. 2010) ("Because the term

21

'includes' is not exhaustive, the definition of [another guideline provision] is not limited to the examples set out in the guidelines.") (cleaned up).  The commentary lists examples of who would fall within the scope of those having "custody, care, or supervisory control" over a minor, but it specifies that the examples are only "among those who would be subject to this enhancement."  U.S.S.G. § 2G2.1 cmt. n.5(A) (emphasis added).

And the commentary twice notes that the § 2G2.1(b)(5) enhancement can apply to defendants entrusted with the victim only temporarily, meaning there is no requirement that the defendant and the victim have a long-term relationship.  See id.  Finally, the commentary instructs courts to consider the "actual relationship" instead of just the "legal status" between the defendant and the victim, which requires a functional approach instead of a formalistic one.  See id.

In addition to the interpretative approach or leaning that the commentary advises using, the plain meaning of the operative phrase in § 2G2.1(b)(5) is pretty plain.  In the phrase "custody, care, or supervisory control" the word that seems most apt in this case is "care."  To articulate that word's meaning, dictionary definitions are helpful.  "Care" means having a minor in one's "charge" or under one's "protection" and having "responsibility" to "watch over or attend to" her.  See Care, Webster's New World College Dictionary (5th ed. 2020); see also Care, Oxford English Dictionary (2d ed. 1989) ("Charge; oversight with a view to

22

protection, preservation, or guidance."). That meaning is illustrated by the common phrase "to take care of," which means "to look after" and "see to the safety or well-being of." See Care, Oxford English Dictionary (2d ed. 1989); Look, Oxford English Dictionary (2d ed. 1989) ("To attend to; to take care of; to 'see to' the safety or well-being of."). Those consistent dictionary definitions "confirm[] our common sense impression," CBS Inc. v. PrimeTime 24 Joint Venture, 245 F.3d 1217, 1223 (11th Cir. 2001), that the plain meaning of stating that a child is in a person's care is simply to say the person is responsible for looking after the child's wellbeing.

The commentary to the guideline also supports that plain meaning in its discussion of what it means for a child to be in the defendant's "custody, care, or supervisory control." It lists "teachers, day care providers, baby-sitters, or other temporary caretakers" as among those who would qualify for the enhancement. See U.S.S.G. § 2G2.1 cmt. n.5(A). Of course, each of those examples describes a person who "looks after" and has responsibility for the safety and wellbeing of a minor who is in that person's "care." Because the commentary list is non-exhaustive and the enhancement is to be applied broadly, the operative language must include defendants whose roles in the care of children are comparable to one or more of the commentary's examples.

23

Analogizing to the commentary's examples is consistent with what other circuits have done. See United States v. Gonyer, 761 F.3d 157, 170–71 (1st Cir. 2014) (affirming the enhancement when the defendant's position of work supervisor over the victim was "readily analogized to the position occupied by a teacher or baby-sitter"); United States v. Beasley, 688 F.3d 523, 535 (8th Cir. 2012) (affirming the enhancement when the defendant had "at least as much 'care, custody, or supervisory control' over th[e] minors as would a teacher, baby-sitter, or day care provider"); Alfaro, 555 F.3d at 498 (affirming the enhancement when the government had argued to the district court that "if the victim had injured herself, [the defendant] would have taken her to the emergency room, would have signed the applicable forms, and would have requested for her to receive treatment," so "the victim was under [the defendant's] custody and care and control just as much as if he were her babysitter") (quotation marks omitted).

Under the plain meaning of being in someone's "care," D.J. was "in the care of" Isaac at the times when he sexually abused her. He was looking after the minor D.J., who was 13 years old. He had been providing D.J. and her family with the necessities of life when he picked her up in his car on the first day he molested her, and he was the only adult alone with her when he committed his crimes. While D.J. was alone with him, Isaac was the adult responsible for looking after her

24

wellbeing.  She was in his care. The same is true of the second occasion on which he sexually abused her.

Isaac's "custody, care, or supervisory control" over D.J. on the two occasions is comparable to the examples in the commentary.  At the very least, he had the same kind of "care" over D.J. as the temporary caretaker example the commentary provides.  Like a temporary caretaker, Isaac was trusted with D.J.  Cf. U.S.S.G. § 2G2.1 cmt. n.5(A) (noting the enhancement "includes offenses involving a minor entrusted to the defendant").  The stipulated facts included that Isaac "gain[ed] the family's trust" and, relying on those facts, the district court found that "quite frankly, by gaining the family's trust, [Isaac] got [D.J.] alone" and that on the two dates of abuse Isaac "had access to the child, the minor, because of the trust he had earned from the family." (Emphasis added.)  That factfinding was not clear error.

Isaac fit the commentary's example of a temporary caretaker because as a 44-year-old adult and the only adult present, he had caretaking responsibilities for D.J.  See Beasley, 688 F.3d at 535 (affirming enhancement despite the defendant's argument that he was "merely a shop owner, [and] not a caregiver or custodian" when the defendant "was the primary, and maybe the only, adult present" for overnight lock-ins at a video game store); cf. Alfaro, 555 F.3d at 498 (noting the government's argument to the district court that "if the victim had injured herself,

25

[the defendant] would have taken her to the emergency room, would have signed the applicable forms, and would have requested for her to receive treatment," so the "victim was under [the defendant's] custody and care and control just as much as if he were her babysitter"). It is not necessary for Isaac to have claimed, or had bestowed on him, some formal title of caretaker; instead, his "actual relationship" with D.J. at the time he sexually abused her establishes that he had caretaking responsibility for her.

Another similarity to a temporary caretaker was that Isaac had a broadly comparable degree of authority over D.J. Cf. United States v. Murrell, 368 F.3d 1283, 1289–90 (11th Cir. 2004) (interpreting "custody, care, or supervisory control" as used in U.S.S.G. § 2G1.1 cmt. n.8 and holding that it applied to someone who "exercised such authority" over the minor as to "direct or command [her] actions"). Isaac's thirty-year age difference over D.J., his having established himself as a provider for her, and being all alone with her are facts that show he had authority over her while she was alone with him. See Alfaro, 555 F.3d at 500 ("[T]his Court concludes that the 20-year age difference between [the defendant] and his teenage minor victim . . . mitigates against a finding that the two were 'peers.'"); see also United States v. Blackbird, 949 F.3d 530, 532 n.2 (10th Cir. 2020) ("While age is not dispositive, we consider it a relevant factor in determining whether a minor is in defendant's custody, care, or supervisory

26

control.") (interpreting "custody, care, or supervisory control" as used in U.S.S.G. § 2A3.2(b)(1)); Gonyer, 761 F.3d at 170 (affirming enhancement and noting that one of the reasons the district court applied the enhancement was "the stark 26-year age difference" between the defendant and victim).

Isaac stipulated that D.J. followed his commands when he "directed [her] to pull down her underwear and display her naked vagina" and "directed the child to perform oral sex on him." (Emphasis added.) That shows Isaac's authority over D.J. Cf. Murrell, 368 F.3d at 1290 (undercover agent had "custody, care, or supervisory control" over fictitious minor daughter when he "was in a position to direct or command the actions of the" fictitious daughter) (emphasis added).

For those reasons, and in light of the record and the stipulated facts, we are not left with a "definite and firm conviction that a mistake [was] committed" by the district court in applying the § 2G2.1(b)(5) enhancement. Rothenberg, 610 F.3d at 624 (quotation marks omitted). Instead, we are convinced the court was entirely correct in doing so.

## B. The Pattern of Behavior Enhancements

Isaac also contends that the district court erred in applying the §§ 2G2.2(b)(5) and 4B1.5(b)(1) enhancements because the two separate occasions of sexual abuse he stipulated to don't "establish a pattern." Under § 2G2.2(b)(5) a defendant convicted of possessing child pornography qualifies for an increase to

his offense level if he "engaged in a pattern of activity involving the sexual abuse or exploitation of a minor." A pattern is "any combination of two or more separate instances of the sexual abuse or sexual exploitation of a minor by the defendant" regardless of whether the abuse "occurred during the course of the offense," "involved the same minor," or "resulted in a conviction for [the] conduct." Id. § 2G2.2 cmt. n.1 (emphasis added). "Sexual abuse or sexual exploitation" includes the production of child pornography. See id. (incorporating the conduct described in 18 U.S.C. § 2251(a) into the definition).

Under § 4B1.5(b), in any case where (1) the defendant's conviction is of a "covered sex crime," (2) he is not a career offender under § 4B1.1, and (3) he did not commit the offense after having sustained at least one "sex offense conviction," he qualifies for a five-level increase if he "engaged in a pattern of activity involving prohibited sexual conduct." Id. § 4B1.5(b). It is undisputed that the (1), (2), and (3) conditions are met. The dispute is about whether Isaac "engaged in a pattern" of prohibited sexual conduct. A pattern, again, is "at least two separate occasions." Id. § 4B1.5 cmt. n.4(B)(i). Isaac stipulated to producing child pornography of the victim on both February 22 and 24. The production of child pornography occurred on two different days and was not continuous. The production on February 22 was separated from the production on February 24 by

28

other events. Two separate occasions is a pattern under these particular guidelines. The district court did not err in applying the two enhancements.

### C. Substantive Reasonableness

Finally, Isaac contends that regardless of the sentence enhancements, his 80-year sentence was substantively unreasonable. He says that it was unreasonable because the district court paid only lip service to the § 3553(a) factors and ignored his "redeeming qualities," and because it is "humanly impossible for [him] to complete" his sentence.

The burden is on Isaac to show that his sentence is unreasonable in light of the facts of this case and the § 3553(a) factors. United States v. Tome, 611 F.3d 1371, 1378 (11th Cir. 2010). We review the reasonableness of the sentence only for an abuse of discretion, and in conducting our deferential review we consider "the totality of the circumstances, including the extent of any variance from the Guidelines range." Gall v. United States, 552 U.S. 38, 51 (2007); accord United States v. Irey, 612 F.3d 1160, 1188–90 (11th Cir. 2010) (en banc). Though we don't "automatically presume a sentence within the guidelines range is reasonable, we ordinarily expect" it to be. United States v. Hunt, 526 F.3d 739, 746 (11th Cir. 2008) (quoting United States v. Talley, 431 F.3d 784, 788 (11th Cir. 2005)) (cleaned up).

"A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." Irey, 612 F.3d at 1189 (quotation marks omitted). The district court commits a clear error of judgment "when it considers the proper factors," but "weighs those factors unreasonably, arriving at a sentence that does not 'achieve the purposes of sentencing as stated in § 3553(a).'" Id. (quoting United States v. Pugh, 515 F.3d 1179, 1191 (11th Cir. 2008)). The district court is "not required to state on the record that it has explicitly considered each of the § 3553(a) factors or to discuss each of the § 3553(a) factors." United States v. Sanchez, 586 F.3d 918, 936 (11th Cir. 2009) (quotation marks omitted). Instead, it is enough when the "court considers the defendant's arguments at sentencing and states that it has taken the § 3553(a) factors into account." Id. Although the district court must consider all the applicable § 3553(a) factors, it does not have to give all of them equal weight and it may in its sound discretion attach "great weight to one factor over others." United States v. Rosales-Bruno, 789 F.3d 1249, 1254 (11th Cir. 2015) (quotation marks omitted). The combined effect of all of these principles is that "[s]ubstantively unreasonable sentences are rare." United States v. Kirby, 938 F.3d 1254, 1259 (11th Cir. 2019) (quotation marks omitted). The sentence in this case is not one of those rare ones.

The district court considered all of the arguments Isaac made for a lighter sentence. It also stated on the record that it had considered the § 3553(a) factors, along with the PSR and advisory sentencing guidelines. See United States v. Sarras, 575 F.3d 1191, 1220 (11th Cir. 2009) ("[T]he district court expressly stated that it had reviewed the PSI and the parties' submissions and had considered the advisory guidelines, the minimum mandatory sentence required by statute, and the § 3553(a) factors. Further, the court expounded on several of the § 3553(a) factors."). The record convinces us that the court did carefully consider the § 3553(a) factors, weighed them without making a clear error of judgment, and provided sufficient justification for the sentence it imposed.

To begin with, the district court said that the impact of Isaac's crimes on D.J., the victim, weighed heavily in its decision. As the court put it, D.J. "has already gotten a life sentence." The court explained to Isaac that victim impact, though certainly not the only factor, is a "big part of what we do here, because we don't want victims to become vigilantes and take matters into their own hands."

The court certainly did not err in considering the impact of Isaac's crimes on D.J. As we stated in our Irey decision: "The seriousness of a crime varies directly with the harm it causes or threatens. It follows that the greater the harm the more serious the crime, and the longer the sentence should be for the punishment to fit the crime." Irey, 612 F.3d at 1206. That is especially relevant in cases involving

31

the production of child pornography.  See id. at 1208 ("When child pornography is produced in conjunction with the sexual abuse of children, as it was here, the harm to the child victims is magnified and perpetuated."); see also United States v. Hall, 965 F.3d 1281, 1286–87 (11th Cir. 2020) (discussing how child sexual abuse that included the production of child pornography caused the victim's "mental health struggles over the years," "a lot of . . . depression," a history of nightmares, and self-destructive behavior including cutting her "arms real bad"); Sarras, 575 F.3d at 1220 (approving the district court's consideration of "the fact that the [child pornography] victim will probably, even with counseling, never fully recover from this") (quotation marks omitted).

The district court was also "taken aback" by Isaac's apparent lack of remorse and failure to "understand the enormity" of what he had done.  The court's reaction stemmed from how Isaac characterized his own possession of child pornography depicting the sexual torture of toddlers and infants, his own grooming and sexual abuse of a 13-year-old girl, and his own photographing and video recording of that sexual abuse.  Isaac characterized it as "just a bad judgment."  As the district court aptly noted, that's the kind of thing you expect to hear "from someone who's been caught shoplifting or writing a bad check" and not from someone who's admitted to "unthinkable heinous behavior."

Isaac's incongruent comments suggested to the district court that he may not have been truly remorseful and that he may not have understood the true severity and "enormity" of his crimes. The court appropriately considered that. See Hall, 965 F.3d at 1292, 1296, 1299 (approving district court's consideration of the defendant's lack of remorse, lack of insight into the harm to his victims, and apparent lack of understanding of the severity of his crimes); Sarras, 575 F.3d at 1220 (approving district court's consideration of the defendant's lack of remorse).

The district court also did not err in considering the seriousness of Isaac's offense, calling it "the un-Holy Trinity." That un-Holy Trinity was first earning the family's trust, then sexually abusing the child, then filming it. The court took into account the fact that Isaac's behavior was calculated and systematic and expert, and that Isaac "saw the goal" and used "all of the tools in [his] toolbox to get from point A to point B," and that he could not have done "a more textbook version of grooming." And because Isaac recorded it, the district court noted, there will always be a concern that those images might "pop up later" for others to see, tormenting D.J. all over again. We would add that Isaac should know that concern is a real one. On his phones were between 213 and 243 child porn images, several coming from infamous "series" that have been widely circulated on the internet, and that have caused the victims in them endless pain. Given that, and given the calculated way in which Isaac gave a hope of security to a homeless family only to

33

rip that hope away by sexually abusing a 13-year-old girl, we can't say the district court clearly erred in finding that it does not "get[] much worse than this" and in considering the "heinous" nature of Isaac's crimes in sentencing. See, e.g., Sarras, 575 F.3d at 1220 (approving district court's consideration of the defendant's "despicable offense") (quotation marks omitted).

Finally, as for Isaac's complaint that he won't live to see the end of his 80-year sentence, that fact doesn't establish that the sentence is unreasonable. We've upheld time and again sentences that will outlast a child pornographer's life. See Kirby, 938 F.3d at 1258–59 (affirming a 120-year sentence for a defendant whose initial guidelines calculation of life, like Isaac's, was greater than the statutory maximum); United States v. Fox, 926 F.3d 1275, 1276, 1282 (11th Cir. 2019) (affirming a 30-year sentence for a 60-year-old defendant convicted of one count of production of child pornography and rejecting the argument that the district court should have given greater weight to the defendant's age); Sarras, 575 F.3d at 1208, 1219–21 (affirming a 100-year sentence for a defendant whose initial guidelines calculation of life, like Isaac's, was greater than the statutory maximum); see also Irey, 612 F.3d at 1220–21 (collecting cases affirming various decades long sentences for offenses involving sexual abuse of children); Sarras, 575 F.3d at 1220–21 (same).

34

In this case, as in all of those, the district court did not abuse its discretion and act unreasonably in imposing a sentence that the defendant either was highly unlikely to, or could not possibly, outlive. The sentence was not unreasonable.

**AFFIRMED.**