[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-15323

_____

D.C. Docket No. 1:17-cr-20392-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

WILLIE EVANS,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(May 6, 2020)

Before ROSENBAUM, GRANT, and HULL, Circuit Judges.

GRANT, Circuit Judge:

Responding to 911 calls of shots fired, police officers kicked down the door

to Willie Evans's home after they heard whimpering from inside.  Warrantless

searches of private dwellings are presumptive violations of the Fourth Amendment, but the government says the search was justified under what's known as the emergency aid exception. Although Evans was already in custody and posed no threat, a police officer heard footsteps and a whimpering noise coming from inside Evans's locked home—prompting officers to breach the door. As police swept the home for an injured person, they found several firearms that Evans, a convicted felon, was prohibited from possessing. And the whimpering noise? That apparently came from one of Evans's dogs—unharmed, we happily note.

The major question presented on appeal is whether it was reasonable for officers, mistaking a dog's whimper for a person in distress, to enter Evans's home without a warrant. Given the totality of the circumstances, we say yes. We also reject two sentencing challenges brought by Evans and therefore affirm his felon-in-possession conviction and 70-month term of imprisonment.

I.

On the morning of May 30, 2017, officers of the Homestead Police Department received multiple 911 calls reporting gunshots in the Keystone Village area of Homestead, Florida. Within minutes, officers arrived at the home of Willie Evans. Once there, they encountered Evans's girlfriend, who was outside in tears with two small children. She told the officers that she and Evans had just had an argument, and that he had threatened to shoot himself. As they were arguing, she said, Evans stormed out of the house; she heard multiple gunshots.

Between the gunfire and the arrival of the police, Evans went back into his house. At first the officers could not get him to leave the house, but he came out

after urging from his girlfriend.  He locked the door behind him.  At that point, police handcuffed him and placed him in a squad car.  One of the officers spotted four spent shell casings in the driveway.  Another officer, positioned near a window, heard noises that sounded "a little bit like footsteps" and "like somebody crying or whimpering coming from inside the house."  The officer advised over his radio that he heard a crying noise coming from inside the house.

Concerned by the sounds, the officers decided to enter the house to "make sure there's nobody hurt, no other people with guns."  When Evans said he did not have a key to his house, the police kicked in the door.  While inside, officers noticed two firearms inside a closet.  They also encountered "a couple of dogs"— the apparent source of the whimpering noise.  According to police, the safety sweep lasted approximately four or five minutes.  The officers left the house and stayed outside while they wrote up a search warrant.  Several hours later, after obtaining a warrant and then conducting a more thorough search, officers recovered a rifle, three handguns, and ammunition.  On June 9, 2017, a grand jury indicted Evans for being a felon in possession of all four firearms and various types of ammunition.

Evans moved to suppress all of the evidence obtained in the initial search, including any observations that formed the basis of the later search warrant (and thus anything found when that warrant was executed).  A magistrate judge recommended that Evans's motion be denied.  According to the magistrate, the initial sweep of the house fell within the exigent circumstances exception to the general requirement that police obtain a warrant before searching a private

3

residence.  The district court adopted this recommendation, and Evans pleaded guilty to the felon-in-possession violation.  *See* 18 U.S.C. § 922(g)(1).  He preserved the right to appeal the denial of his suppression motion.  The parties dispute whether he also preserved his sentencing arguments, but that turns out not to matter because the result is the same under any standard of review.

## II.

On appeal of a district court's ruling on a motion to suppress, we review the court's rulings of law de novo and its findings of fact for clear error.  *See United States v. Spoerke*, 568 F.3d 1236, 1244 (11th Cir. 2009).  We review the district court's application of the Sentencing Guidelines de novo and its findings of fact for clear error.  *See United States v. Smith*, 480 F.3d 1277, 1278 (11th Cir. 2007).

## III.

Evans contends that the district court should have suppressed anything the police officers learned or saw during their warrantless search of his home.  Not so.  He also levels two challenges to his Guidelines sentence, one textual and the other evidentiary.  Both fail.

## A.

The Fourth Amendment requires that searches be reasonable.  *See* U.S. Const. amend. IV.  And warrantless searches and seizures inside a home are presumptively *un*reasonable.  *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006).  But that presumption can be overcome if the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless search is objectively

4

reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 394 (1978) (quotation marks and citation omitted).

The "most urgent" of the exigencies is the emergency aid exception. *United States v. Timmann*, 741 F.3d 1170, 1178 (11th Cir. 2013). Under that exception, "officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (quoting *Brigham City*, 547 U.S. at 403). The burden of proving this exception lies with the government. *See United States v. Holloway*, 290 F.3d 1331, 1337 (11th Cir. 2002). The specific test is not whether the officer actually believed that there was an emergency inside the house, but "whether there was 'an objectively reasonable basis for believing' that medical assistance was needed, or persons were in danger." *Michigan v. Fisher*, 558 U.S. 45, 49 (2009) (quoting *Brigham City*, 547 U.S. at 406).

Evans says that it is "objectively unreasonable for a trained police officer to hear a dog whimpering and claim he cannot tell the difference between a whimpering dog and a human in pain." We disagree. Even under ideal conditions, we do not find it implausible that a reasonable person might sometimes mistake the sound of an animal for that of a human.

But these were not ideal conditions. Consider the scenario: Officers responded to multiple 911 calls reporting gunshots. Arriving just minutes later, they were informed by Evans's tearful girlfriend, who herself had just come out of the home, that she and Evans had been in an argument and that he had threatened to kill himself. And Evans—the suspected gunman—was not a model of candor

5

and cooperation.  He initially refused to leave his house, giving police reason to question whether there was someone else inside with him.  And when he finally did exit, locking the door behind him, he tried to mislead the officers with the (obviously wrong) suggestion that the reported gunshots might have been children playing with fireworks; that scenario was contradicted both by Evans's girlfriend and by the spent shell casings outside the house.  Given the totality of these circumstances, it was not objectively unreasonable for an officer to mistake the sounds of a dog whimpering—through the wall of a home—for a person in distress.

Our precedents do not require police to "know the unknowable on pain of suppression." *Montanez v. Carvajal*, 889 F.3d 1202, 1210 (11th Cir. 2018).  As the Supreme Court said in *Fisher*, officers "do not need ironclad proof of a likely serious, life-threatening injury to invoke the emergency aid exception."  558 U.S. at 49 (quotation marks omitted).  *Cf. Holloway*, 290 F.3d at 1340 ("People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." (quoting *Wayne v. United States*, 318 F.2d 205, 212 (D.C. Cir. 1963))).  Instead, we look to the entirety of the circumstances to see whether a reasonable officer, confronted with those circumstances, could have objectively believed that an immediate search was necessary to safeguard potential victims.

Our opinion in *Holloway* is instructive.  There, officers responded to 911 calls reporting gunfire and arguing, encountered a couple on the front porch of their house, and saw a shotgun shell on a nearby picnic table.  *See* 290 F.3d at

6

1332–33.  They had little else to go on.  They did not see any person in dire need of aid, and unlike this case, they did not hear a whimper or a cry coming from inside the house.  Yet we had no trouble concluding that the circumstances justified an immediate warrantless search.  Today we reach the same conclusion as we heed *Holloway*'s instruction that the "possibility of a gunshot victim lying prostrate in the dwelling created an exigency necessitating immediate search."  *Id.* at 1338.

Moreover, the close temporal proximity between gunfire and police response make this case different than *Timmann*, where we said that the emergency aid exception did not apply to a routine service call regarding a bullet hole that officers figured out had been made at least 39 hours earlier.  *See* 741 F.3d at 1173–74, 80.  Because the officers had no other evidence of a fight or injury—certainly not a recent one—it was not reasonable for them to believe that someone needed immediate aid, and their warrantless entry was impermissible.  *Id.* at 1181.  Here, by contrast, the recency of the gunfire, the 911 calls, and the totality of the scene on arrival provided Homestead police officers "indicia of an urgent, ongoing emergency" that were not present in *Timmann*.  *Id.* at 1180.

\*       \*       \*

Evans's girlfriend now insists she told officers there were only dogs in the home, and that they were the source of the whimpering noise.  Unfortunately for Evans, that does not move the needle.  To begin, the magistrate judge already found inconsistencies in the testimony of Evans's girlfriend and concluded that she was not a credible witness.  That kind of credibility determination is within the trial

7

court's purview, and we "defer to the magistrate judge's determinations unless his understanding of the facts appears to be unbelievable." *United States v. Ramirez-Chilel*, 289 F.3d 744, 749 (11th Cir. 2002) (quotation marks and citation omitted). Evans presents no good reason—nor do we find one in the record—to doubt the magistrate judge's credibility determination.

What's more, even if we now found Evans's girlfriend trustworthy, our own belief would not require a finding that it was unreasonable for police themselves not to believe her: police should not have to accept the declarations of interested witnesses as final and conclusive. We will not put police in the position of avoiding an exigent search when the evidence supports it, simply because judges may find the contrary assertion of an on-the-scene witness more compelling when they read it years after the fact.

Given all this, we cannot blame the officers for disregarding the claims of Evans's girlfriend. We thus affirm the district court's denial of Evans's motion to suppress.

### B.

Evans also challenges two sentencing findings. *First*, he received a base offense level of 22 because he possessed a "semiautomatic firearm that is capable of accepting a large capacity magazine." U.S. Sentencing Guidelines § 2K2.1(a)(3)(A)(i) (2016). Evans says, however, that his offense level is incorrect because an unloaded gun cannot qualify under the possession guideline used to sentence him. We reject his invitation to grammatical innovation. *Second*, Evans received a four-level enhancement for possessing a rifle that had an "obliterated

8

serial number," but he says that no evidence supports this enhancement. U.S.S.G. § 2K2.1(b)(4)(B). On this claim, we reject his invitation to ignore the record. And, as we noted at the outset, the parties dispute whether this is the first time that Evans has argued these points. We need not sort out that dispute, though, because Evans loses either way.

1.

Police found a semiautomatic pistol (Beretta 9mm) in Evans's home. They also found a high-capacity magazine capable of accepting 17 rounds of ammunition. The Sentencing Guidelines impose a base level of 22 for offenses involving a "semiautomatic firearm that is capable of accepting a large capacity magazine." U.S.S.G. § 2K2.1(a)(3)(A)(i). The Guidelines commentary explains what that means:

> A semiautomatic firearm that has the ability to fire many rounds without reloading because at the time of the offense
>
> > (A) the firearm had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition; or
> >
> > (B) a magazine or similar device that could accept more than 15 rounds of ammunition was in close proximity to the firearm.

U.S.S.G. § 2K2.1 cmt. n.2.[1]

Evans argues that his pistol was not "capable of accepting a large capacity magazine" under the Guidelines' definition because the magazine was unloaded

---

[1] "[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of, that guideline." *Stinson v. United States*, 508 U.S. 36, 38 (1993).

9

and not attached to the gun at the time of his offense.  In other words, he says that because the magazine found near his gun was unloaded, the gun itself was not—at that time—capable of accepting a large magazine.

Stating his argument in plain English is almost enough to dismiss it.  Still, we offer a few of the reasons that it is an incorrect interpretation of the text.  To begin, the words of the guideline—"capable of accepting a large capacity magazine"—are words of possibility, not actuality.  Capable means "having the ability, fitness, or quality necessary to do or achieve a specified thing."  *New Oxford American Dictionary* (3d ed. 2010).  *See also Webster's New World College Dictionary* (5th ed. 2018) ("susceptible of; admitting of; open to").  Loaded or not, Evans's firearm was able to accept a large capacity magazine.

Nothing in the Guidelines commentary detracts from the obvious conclusion that Evans's firearm qualifies under the guideline.  The phrase "at the time of the offense" modifies the subparts that follow it, and not, as Evans suggests, the preceding phrase "the ability to fire many rounds without reloading."  We know this is true for (at least) three reasons.  *First*, it is commonly understood that "[m]odifiers should come, if possible, next to the words they modify."  William Strunk Jr. & E.B. White, *The Elements of Style*, 30 (50th Anniversary ed. 2009).  In somewhat plainer terms, there is no grammatical reason that "at the time of the offense" would apply to anything other than the two subparts that immediately follow it.  *Second*, under either subpart, the heightened base level applies if a qualifying magazine (i.e., a magazine "attached to" or "in close proximity to" the firearm) "*could* accept" more than 15 rounds.  U.S.S.G. § 2K2.1 cmt. n.2

10

(emphasis added).  Again, a word of possibility.  By the terms of the guideline, even an empty magazine would be enough if it could hold fifteen or more rounds, but under Evans's interpretation a firearm with an empty magazine attached or nearby could never qualify.  And *third*, under subpart B, the guideline applies based on the mere proximity of a high capacity magazine—regardless of whether any magazine is actually attached to the firearm.

All these points refute the suggestion that the heightened base level applies only to firearms that could actually fire more than 15 rounds at the precise moment they are discovered by police.  Criminals cannot escape the heightened base level by keeping their magazines *next to* their guns rather than *attached to* their guns, nor by keeping their magazines empty.  *See United States v. Davis*, 668 F.3d 576, 579 (8th Cir. 2012) ("[T]he phrase, 'because at the time of the offense,' comes immediately before the condition that the large capacity magazine must be either (A) attached, or (B) in close proximity to, the semiautomatic firearm.  This strongly suggests that the phrase was not intended to modify an earlier condition— that the firearm 'has the ability to fire many rounds without reloading.'").  We have no doubt that this guideline applies to Evans.

2.

Before sentencing, Evans challenged the assertion in the Presentence Investigation Report (PSR) that the rifle seized from his home had an obliterated serial number.  At the sentencing hearing, the government produced a Ruger rifle, purportedly the one found in Evans's home and referenced in the PSR.  After

11

examining the rifle, the sentencing judge determined that "the serial number has been erased."

On appeal, Evans argues for the first time that he "never admitted to possessing a Ruger rifle.  Nor did the government provide any testimony that a Ruger rifle was involved in the offense."  Essentially, his argument rests on three facts: (1) the indictment mentions only a "Muzzelite" rifle, not a Ruger rifle;[2] (2) neither the PSR nor the factual proffer mentioned a "Ruger" rifle; and (3) there is no evidence other than the good word of the government's attorney that the rifle presented at sentencing was the rifle seized from Evans's home.

The transcript of the sentencing hearing tells a different story.  Detective Raul Cabrera gave sworn testimony at the sentencing hearing that he located the Ruger rifle presented at sentencing and impounded it himself.[3]  Cabrera's testimony is direct evidence that the rifle mentioned in the indictment was the rifle inspected by the sentencing court.  A sentencing court's findings "may be based on evidence heard during trial, facts admitted by a defendant's plea of guilty, undisputed statements in the presentence report, or *evidence presented at the sentencing hearing*."  *United States v. Wilson*, 884 F.2d 1355, 1356 (11th Cir. 1989) (emphasis added).  The judge did not err in relying on this testimony, and

---

[2] "Muzzelite" is not a brand of rifle.  Rather, it appears to be a brand of aftermarket attachments made for Ruger rifles.  *See* Muzzelite Bullpup Stocks, http://muzzelite.com [https://perma.cc/QJ5S-CTVK] (last visited Apr. 28, 2020).  At the sentencing hearing, the prosecutor testified that the rifle's "plastic casing is an after-market piece that is placed on the firearm."  Likewise, Detective Cabrera testified that he disassembled the rifle "because of the after-market part placed on it."

[3] Evans concedes this point in a letter correcting his initial brief.

Evans has offered nothing, at the hearing or on appeal, to bring it into question. We reject this sentencing challenge as well.

*    *    *

Police had an objectively reasonable basis for entering Willie Evans's home without a warrant. We therefore affirm his conviction. And because the sentencing court did not err either in its interpretation of the Sentencing Guidelines or in its findings of fact, we also affirm his sentence.

**AFFIRMED.**