[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-10794

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JAVARESE ANTWANE HOLMES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:22-cr-20230-DMM-1

_____

Before JILL PRYOR, BRANCH, and GRANT, Circuit Judges.

BRANCH, Circuit Judge:

After Javarese Holmes was identified as an arson suspect and drug dealer, he was stopped while driving by police officers. Following the discovery of a gun and drugs during a search of his car, police obtained a warrant to search what they believed to be his residence, turning up another gun, ammunition, and drug paraphernalia.

Holmes was charged with, and eventually convicted of, possessing controlled substances with the intent to distribute, illegally possessing firearms as a convicted felon, and possession of a firearm in furtherance of drug crimes. Holmes contests his conviction and argues that the district court erred by (1) refusing to suppress the evidence obtained from his car and home, (2) admitting under Rule 404(b) of the Federal Rules of Evidence text messages showing he was a drug dealer, (3) permitting a drug enforcement agent to testify as an expert in "firearm usage among street-level dealers" and (4) failing to find that the evidence was insufficient to support his conviction for the firearm offenses. After careful review and with the benefit of oral argument, we conclude that none of his claims have merit. Accordingly, we affirm.

## I.    Background

### A. Factual background

On April 7, 2022, Holmes set fire to a trash can after a store owner confronted him for selling drugs outside the premises. The store owner called the police and showed the security footage to Detective Kelly Gomez. In the video, an individual could be seen

leaving the scene in "a small, dark-colored older model Toyota Corolla." The store owner told police that the Corolla was one of two vehicles Holmes owned.

Based on her initial investigation, Detective Gomez issued a "probable cause" flier[1] instructing officers in her department to arrest Holmes if they encountered him. Two weeks later, Detective Gomez received a tip that Holmes was "at his child's mother's house," which was near the residence where Detective Gomez believed Holmes lived. After failing to see either of his cars at "his child's mother's house," she passed by the residence where she believed Holmes lived and saw Holmes's "purple Corolla parked on the swale in front of the property outside the fence line." Holmes eventually emerged from the residence, drove about a block away, and stopped. As he was exiting the vehicle, Detective Gomez confronted him. Holmes slowly walked away from his car with his hands up, asking "what this was about." He was subsequently arrested without further incident and placed in the back of a patrol vehicle.

"[A]s soon as [Detective Gomez] arrested [Holmes]," she asked fellow officers to help her tow, inventory, and process the car as required by department policy. The policy specified that to

---

[1] Detective Gomez explained that a "probable cause flier" is an internal document prepared by the crime analyst unit of the Miami Gardens Police Department. It is "disbursed via e-mail" department-wide and is intended to inform Miami Gardens officers that probable cause exists to arrest an individual. The flier contains "the defendant's name, information and a photograph and the charges."

ensure the safety of city employees and the proper caretaking of an arrestee's property, a brief inventory of a vehicle to be impounded was required.  The policy mandated that the inventory search include opening all containers and inventorying their contents.[2]

---

[2] The City of Miami Gardens Police Department lays out the procedure for an inventory search of towed vehicles:

> A vehicle may be searched in its entirety without a warrant . . . [i]f a vehicle is impounded or towed . . . .  [T]he vehicle and contents of all containers found within the vehicle, whether locked or unlocked, will be inventoried. . . .  The impounding officer shall conduct an itemized inventory of the vehicle for personal property and place all property of value in safekeeping. . . .  Any containers found in the vehicle shall be opened, and all contents of such containers shall be inventoried. . . .  A locked glove compartment, locked trunk or other locked compartment shall be opened and the contents inventoried if the impounding officer has possession of a key to these areas during the inventory.

The relevant portion a separate Tow Policy also provides:

> In the course of duty on a day-to-day basis, it is necessary for the protection of the employee and the Department to inventory vehicles, vessels or aircraft being towed and/or stored.  Vehicles . . . which are towed . . . incident to an arrest . . . become the responsibility of the impounding Department and employee.  The Department and employee are liable for the vehicle . . . , its parts, and contents. . . .  To insure that liability does not attach for property located within any vehicle . . . , the contents of said vehicle . . . , whether locked, opened or closed, shall be ascertained, inventoried, and recorded on the storage receipt.

After securing Holmes, Detective Gomez eventually returned to the car, where either she or another officer opened the driver's door to the car. Upon peering inside, Detective Gomez saw "a large handgun tucked between the seat and the center console."[3] She ordered the officers to remove the firearm for safety reasons but stopped them from searching further because she "was securing [the car] for a search warrant." Despite the policy's express direction to search all containers, no one completed the inventory at that time.

After the search warrant was obtained, officers completed the search of the car. Among the items they discovered was a backpack next to the center console where the gun was originally located. The backpack contained 20 small baggies containing cocaine, over 100 oxycodone tablets in a bottle, and over 10 small Ziplock bags containing a designer drug called dipentylone.

Based on the discovery of the drugs in Holmes's car, Holmes's connection to the arson, and the fact that Holmes exited the house wearing different clothes than those observed previously in surveillance footage, Detective Gomez sought and obtained a search warrant for the residence Holmes exited prior to his arrest. In the warrant application, she asserted she had probable cause to believe it was his residence and that evidence of the arson would likely be located at the property. The affidavit explained that Detective Gomez expected to find evidence including "[a]ccelerant,

---

[3] The gun was later identified as a Taurus PT1911 .45 caliber pistol.

gasoline, kindling, and/or any other evidence used to commit or aid in the commission of an Arson," and "[a]ny DNA and trace evidence . . . which may be relevant in leading to the identity of the subject(s) responsible for committing an Arson."  The affidavit also sought discovery of additional "[d]rugs, narcotics, and/or any other illegal substances" in connection with the drugs and firearms discovered in Holmes's vehicle.

A search warranted was issued, and when law enforcement executed it, the keys retrieved from Holmes on the day of his arrest fit the front door lock to the residence.  One of the rooms in the residence contained a handwritten letter from Holmes, paperwork from his past state prosecution, and a piece of mail addressed to him.  In that same room, officers found .45-caliber ammunition made by Federal and Winchester, the same brands and caliber of ammunition found in the gun retrieved from Holmes's car.  The search team also found a Taurus Spectrum .380 pistol wedged "[i]n between the box spring and the mattress."  A subsequent search of Holmes's phone revealed that Holmes searched on his iPhone for the exact make and model of the Taurus Spectrum .380 found in the residence.

Finally, the officers found drug paraphernalia scattered throughout the room, including a scale and small baggies commonly used to distribute drugs.[4]

### B. Suppression Hearing

Following his arrest and the searches of the residence and car, Holmes was ultimately charged with four counts: two counts of possession of a firearm and ammunition by a convicted felon, one count of possession with intent to distribute a controlled substance, and one count of possession of a firearm in furtherance of drug trafficking. Holmes pleaded not guilty to all counts and moved to suppress the evidence seized from his car and the residence. Holmes argued that the officers wrongfully failed to obtain a search warrant before opening his car and discovering the firearm and that the warrant to search his residence failed to adequately link him to that residence.

In an oral ruling, the district court denied the motions to suppress and concluded that both challenged searches were permissible. Regarding the warrantless vehicle search during which a gun was found, the district court concluded that the search was a permissible inventory search.[5] The court also provided

---

[4] Later investigations revealed that the home was owned by some other party, who was deceased. Several other individuals were also present in the home at the time the warrant was executed.

[5] The district court also found that the warrantless search did not require suppression because it was a permissible search incident to arrest and because of the inevitable discovery doctrine.

several reasons why the warrant to search the residence for evidence of arson, guns, and drugs was valid. First, Gomez had seen Holmes exiting the residence and had seen Holmes's cars parked there. Second, Holmes "had been drug dealing for a number of years in front of the victim's store," which was a "good basis [to conclude] that it's likely that you're going to find some additional evidence" in that house. Finally, immediately after the arrest, law enforcement began to conduct an inventory search of his car, but stopped upon finding a firearm "not [merely] . . . in the vehicle but found right there, the right-hand side by the driver's seat."

### C. Contested evidence admitted at trial

At trial, the government introduced evidence alleging that Holmes's phone contained text messages, dating between January and April 2022 (right before his arrest), where Holmes discussed drug trafficking. In the texts, Holmes and his contacts talked about buying or selling items such as "gas," "weed," "zone," and "trees," which the government's expert witness testified were slang terms for marijuana. In another message, Holmes bragged, "I'm the plug," which a government expert testified meant a drug supplier.[6] Holmes objected that the text message evidence would be used for improper propensity purposes and that they were unduly

---

[6] Holmes's text messages also identified his address as the residence Officer Gomez observed him exiting prior to his arrest.

23-10794                Opinion of the Court                9

prejudicial, but the district court disagreed and admitted the messages subject to limiting instructions.[7]

The government also called Special Agent Shaun Perry to testify as an expert witness about "the techniques and practices used by street-level narcotics traffickers," such as "the use of firearms for dispute resolution and protection during narcotics trafficking."[8] Agent Perry had worked as a DEA group supervisor for two years and had 26 years' experience at the agency. He had received specialized training to become an agent and had taken various refresher courses to keep current on drug trafficking practices. According to Agent Perry, he had conducted hundreds of narcotics-trafficking investigations over the course of his career, including some involving street-level dealers. Agent Perry often encountered guns "[d]uring arrests, during search warrants, [and]

---

[7] The district court instructed the jury as follows:

> Now, during the trial, you heard evidence of acts allegedly done by the defendant that may be similar to those charged in the indictment, but they were committed on other occasions. You must not consider this evidence to decide if the defendant engaged in the activity alleged in the indictment, but you may consider this evidence to decide whether, one, the defendant had the actual state of mind or intent necessary to commit the crime charged in the indictment; or, two, the defendant committed the acts charged in the indictment by accident or mistake.

[8] Prior to trial and pursuant to Fed. R. Crim. P. 16(a)(1)(G), the government provided notice to the court and Holmes regarding how Agent Perry's training and experience informed his conclusion that drug dealers typically carry firearms to protect themselves and their product as part of their trade.

during . . . investigations involving surveillance." And Agent Perry had testified as an expert roughly a dozen times before this case. Holmes objected, stating only that Agent Perry "[was] not qualified under [Rule] 702." The district court overruled the objection.

Agent Perry then testified that, in his experience, street-level dealers often carry guns because the "enterprise of drug dealing is dangerous" and "[t]hey want to protect themselves from other violent drug dealers" and "to protect their goods, their money, and their stash of drugs." It is common, Agent Perry opined, for a dealer to carry a gun "in their waistband" or "within arm['s] reach if they're in a vehicle." Agent Perry also testified that, in his experience, street-level dealers commonly package drugs into small baggies for distribution. In Agent Perry's opinion, the quantity of drugs seized from Holmes's backpack was consistent with the pattern of a street-level dealer. Finally, Agent Perry interpreted the slang used in Holmes's text messages to be references to drugs and drug transactions.

At the close of the evidence, Holmes made a motion under Rule 29 of the Federal Rules of Criminal Procedure for judgment of acquittal as to each of the four Counts of the indictment for insufficient evidence, which the district court denied.[9] The jury found Holmes guilty on all counts, and the district court sentenced

---

[9] Rule 29(a) requires that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."

Holmes to 240 months' imprisonment, followed by five years of supervised release. He timely appealed.

## II.    Standard of Review

When reviewing a Fourth Amendment suppression claim, we review legal conclusions *de novo* and factual findings for clear error. *See United States v. Evans*, 958 F.3d 1102, 1105 (11th Cir. 2020). And "[w]hen considering a ruling on a motion to suppress, all facts are construed in the light most favorable to the prevailing party below"—here, the government. *United States v. Isaac*, 987 F.3d 980, 988 (11th Cir. 2021) (quotation omitted).

When considering the evidentiary rulings of the district court regarding admissibility of evidence, including expert witnesses, "[w]e review for abuse of discretion the district court's decisions." *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc). "[W]e must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard." *Id.* at 1259.

Finally, "[w]e review *de novo* a [d]istrict [c]ourt's denial of judgment of acquittal on sufficiency of evidence grounds, considering the evidence in the light most favorable to the government, and drawing all reasonable inferences and credibility choices in the [g]overnment's favor." *United States v. Capers*, 708 F.3d 1286, 1296 (11th Cir. 2013). "A jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.* at 1297 (quotation omitted).

Opinion of the Court                    23-10794

### III.    Discussion

Holmes raises five issues on appeal.  The first two contest the district court's refusal to suppress the evidence recovered from his vehicle and the residence. The third deals with the admission of incriminating text messages under Rule 404(b).  The fourth addresses whether Agent Perry should have been allowed to testify as an expert on the firearms practices of street-level drug dealers. The fifth is the sufficiency of the evidence on Holmes's gun charges.

The government argues that the warrantless search of the vehicle was justified and that a sufficient nexus was established between Holmes and the residence to justify the warrant to search his home. The government further contends that the text messages were probative of Holmes's criminal intent and not unduly prejudicial under Rule 404(b), that Agent Perry was a duly qualified expert, and that the evidence was sufficient to support the jury's verdict.  We agree with the government on all issues and affirm the judgment below.

*A. The evidence obtained from Holmes's car was admissible*

Holmes contends that the district court erred in its oral ruling excusing the warrantless search of his car under the inventory exception.[10]  He argues the search was unlawful because

---

[10] The parties briefed, and the district court found applicable, three exceptions to the warrant requirement:  inventory search, search incident to arrest, and inevitable discovery.  Because we find the inventory-search exception applies,

the inventory exception requires government agencies to conduct inventory searches pursuant to a reasonable policy, which Detective Gomez (by her own admission) failed to follow when she cut the search short to seek a warrant before completing a full inventory of the vehicle. He also argues that the government conducted an improper search before starting a lawful inventory search by opening his car door and discovering the gun.

The government responds that Detective Gomez's decision to discontinue the search to seek a warrant after finding the gun (even if she did not strictly comply with the policy) does not defeat the inventory exception because Detective Gomez's actions did not *exceed* the scope of the policy. If anything, the government argues, calling off the search to seek a warrant was "more protective" of Holmes's rights. The government also argues that all evidence in the record showed that opening a car door is the obvious first step in any inventory search.

We agree with the government.

The Fourth Amendment prohibits the government from engaging in "unreasonable searches and seizures" of any individual's person or property. U.S. Const. amend. IV. Generally, the way to ensure the "reasonableness" of any search is by securing a warrant. *See Isaac*, 987 F.3d at 988. However, the Supreme Court has long recognized that certain on-the-ground-circumstances can

_____

we do not address the party's arguments or the district court's reasoning as to the other exceptions.

make even a warrantless search reasonable. *See South Dakota v. Opperman*, 428 U.S. 364, 371–72 (1976).

One such example of a reasonable, warrantless search is what has come to be known as the "inventory search." "It would be unreasonable," the Supreme Court has said, "to hold that police, having to retain [a] car in their custody for . . . a length of time, ha[ve] no right, even for their own protection, to search it." *Id.* at 373 (quotations omitted). The inventory search doctrine does not mean, however, that police have carte blanche to search any car that comes into their possession; rather, police must undertake the search only where authorized by "standardized criteria." *Florida v. Wells*, 495 U.S. 1, 4 (1990). In other words, an officer performing such a search must follow an established policy of his police department to ensure that "an inventory search [] not be a ruse for a general rummaging in order to discover incriminating evidence." *Id.*

We apply the following test to determine if a warrantless search is proper under the inventory search exception: police "do not need a warrant to search an impounded car if they (1) had the authority to impound the car, and (2) followed department procedures governing inventory searches." *Isaac*, 987 F.3d at 988. Such searches are reasonable so long as the searching officer follows department policy in conducting the search and has a "good faith" justification to believe that impoundment and inventory were warranted. *Id.*

Here, Holmes does not appear to contest that police had the authority to impound his car after he was arrested. Nor does he appear to contest that the police department had an inventory search policy that authorized the search of an impounded car. Instead, Holmes argues that opening the door of his car constituted an improper search before the "inventory" process ever began, and that the failure to complete the inventory search after a weapon was discovered shows that "the searching Officer [did not] follow[] department policy" in conducting the search. *Id.*

Holmes's first argument, that opening the door to his car constituted an impermissible search outside the inventory search exception, is easily dismissed. Detective Gomez testified that "as soon as [she] arrested [Holmes]," she asked fellow officers to assist her in towing, inventorying, and processing the car, as required by department policy. And while there was some dispute over who eventually opened the door to initiate the inventory, nothing in the record suggests the door was opened as part of anything other than an inventory search. Further, given that opening a door is the obvious first step in any inventory search, nothing in the act of opening the door itself suggests a departure from typical inventory search procedures.

Holmes's second argument bears more consideration. The relevant Miami Gardens Police Department policy states that "the contents of [an impounded vehicle] . . . , whether locked, opened or closed, shall be ascertained, inventoried, and recorded." Despite this policy, Detective Gomez terminated the inventory search upon

the discovery of the firearm, without inventorying the rest of the contents of the car, until a warrant could be obtained. Holmes thus argues that the failure to complete the search in accordance with department procedures takes the search outside of the exception.

The problem for Holmes is that the Supreme Court has explained that "there is no reason to insist that [inventory searches] be conducted in a totally mechanical 'all or nothing' fashion." *Wells*, 495 U.S. at 4. "[A] police officer may be allowed sufficient latitude to determine whether a particular container should or should not be opened in light of the nature of the search and characteristics of the container itself." *Id.* In other words, "the exercise of judgment based on concerns related to the purposes of an inventory search does not violate the Fourth Amendment." *Id.* And such deference makes sense, given the Supreme Court has repeatedly reminded us that "reasonableness" is the touchstone of the Fourth Amendment. *See id.*; *see also Opperman*, 428 U.S. at 371–72. It would be strange for us to hold that an officer's decision to make a *less invasive* search by deciding to wait for a warrant once evidence was discovered makes the search unreasonable under the Fourth Amendment, where the more invasive search would have otherwise been permitted. *See United States v. Mundy*, 621 F.3d 283, 294 (3d Cir. 2010) (holding that officers' decision to end a valid inventory search and instead "call[] in narcotics investigators" did not defeat inventory search exception).

We therefore hold that the inventory search exception applies to Detective Gomez's search because the failure to search

the car to the maximum extent possible does not show that the search was no longer "reasonable." The "standardized criteria" rule exists to ensure an inventory search "not be used as a pretext for investigatory searches that would otherwise be impermissible." *United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir. 1982). But here, where a written policy exists and police do not "exceed the scope normally permitted for an inventory search," the concern of pretext or abuse falls away. *Id.* The district court did not err when it found that Detective Gomez's truncated warrantless search fell within the inventory search exception and did not violate the Fourth Amendment.

*B. The evidence from the search of Holmes's residence was admissible*

Holmes next argues that the district court erred in failing to suppress the evidence obtained from the search warrant executed on the residence. He contends that probable cause was not established because the "warrant failed to establish a viable nexus between either (i) Mr. Holmes and the Residence; and/or (ii) the Residence and [the presence of] firearms; drugs; or evidence of arson." The government argues that the facts supported probable cause to search Holmes's residence. We again agree with the government.

As discussed above, the typical process for ensuring a search is reasonable under the Fourth Amendment is by obtaining a warrant. *Isaac*, 987 F.3d at 988. In order to obtain a warrant, the Fourth Amendment requires a requesting officer show "probable

cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has expounded upon that language, explaining that for searches of a "place," "probable cause" means "a fair probability that contraband or evidence of a crime will be found in [that] particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983).

Thus, in the context of warrants to search a home, we have explained that in order to establish the requisite nexus between evidence sought and the home itself, an officer need only "establish[] a connection between the defendant and the residence," as well as "a link between the residence and any criminal activity." *United States v. Delgado*, 981 F.3d 889, 897–98 (11th Cir. 2020) (quotation omitted). The connections and links can come from an officer's own observations, witnesses, or other facts. *See United States v. Tate*, 586 F.3d 936, 943 (11th Cir. 2009). Of course, the mere fact that a particular suspect has possessed contraband in the past does not suffice. There must be a probability of criminal activity at the residence in question. *See United States v. Lockett*, 674 F.2d 843, 846 (11th Cir. 1982). But where an officer links a residence to a defendant found in possession of contraband and explains why contraband is likely to be found in that location, issuance of a warrant is appropriate. *Tate*, 586 F.3d at 943 (holding that issuance of a warrant was justified where the agent linked the defendant to that residence, the residence to the crime, and "the car parked at [the] residence was the getaway car in one of the robberies").

23-10794                Opinion of the Court                19

Here, the district court did not err when it identified several reasons why a sufficient nexus had been established between the residence and Holmes's criminal activity. First, the evidence of the materials used in the arson had not yet been discovered when the victim linked Holmes to the arson and identified where he lived. *See United States v. Johnson*, 713 F.2d 654, 660 (11th Cir. 1983) ("There is no need to establish the reliability of information received from the victim of a crime.") Second, Holmes "had been drug dealing for a number of years in front of the victim's store," and this was a "good basis [to conclude] that it's likely that you're going to find some additional evidence" in that house. *United States v. Albury*, 782 F.3d 1285, 1292 (11th Cir. 2015) ("Where evidence shows that the defendant is in possession of contraband that is of the type that one would normally hide at their residence, there is sufficient probable cause to support a search warrant." (quotation and brackets omitted)). Third, the car in which Holmes had been spotted driving away from the arson was parked in front of the residence, and Holmes exited the residence when he entered that car while being observed by Detective Gomez. *Tate*, 586 F.3d at 943.

Those facts are enough to "establish[] a connection between the defendant and the residence," as well as "a link between the residence and [Holmes's] criminal activity." *Delgado*, 981 F.3d at 897–98 (quotation omitted). Holmes's motion to suppress the evidenced seized pursuant to the warrant to search his residence was thus appropriately denied.

### C. The text messages were admissible

Holmes next argues that the district court erred in admitting text messages generally suggesting his involvement in the drug trade under Rule 404(b). He argues that they did not show that the alleged drug transactions occurred; accordingly, their admission violated Rule 404(b)(1) of the Federal Rules of Evidence, which prohibits "propensity evidence." He also contends that the texts were admitted in violation of Rule 403 because they were substantially more prejudicial than probative. We disagree on both fronts.

The Federal Rules of Evidence generally forbid admitting evidence of past "crimes, wrongs, or acts" to prove they acted consistently with a particular character trait. *See* Fed. R. Evid. 404(b)(1). However, Rule 404(b)(2) provides that evidence of prior crimes or bad acts "may be admissible for another purpose [other than showing the person acted in accordance with a character trait], such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." To be admissible under Rule 404(b)(2), evidence of prior crimes or bad acts must be (1) relevant to an issue other than the defendant's character; (2) there must be enough proof for the jury to find by a preponderance of the evidence that the defendant committed the extrinsic act; and (3) the probative value of the evidence must not be substantially outweighed by its undue prejudice under Rule 403. *United States v. Sterling*, 738 F.3d 228, 237 (11th Cir. 2013). Holmes challenges the second and third factors.

We turn first to Holmes's argument that the text messages were admitted in violation of Rule 404(b) because they did not establish that he engaged in prior drug transactions. The Supreme Court has explained that evidence of past crimes or other bad acts should only be admitted under Rule 404(b) "if there is sufficient evidence to support a finding by the jury that the defendant committed the . . . act." *Huddleston v. United States*, 485 U.S. 681, 685 (1988). Evidence is sufficient where "the proponent [provides] enough evidence for the trial court to be able to conclude that the jury could find, by a preponderance of the evidence, that the prior act had been proved." *United States v. Green*, 873 F.3d 846, 864 (11th Cir. 2017). This evidence can include "detailed account[s] of the [defendant's] conversation" planning the illicit activity at issue. *United States v. Fey*, 89 F.4th 903, 912 (11th Cir. 2023).

Here, there was ample evidence that would allow a reasonable jury to find that Holmes engaged in the drug transactions described in the texts. First, the text messages came from Holmes's cell phone (which was found on his person), and he identified himself by name in the messages, thereby tying him to the acts described therein. Second, the government's expert testified that those messages described drug transactions. While Holmes may contest that interpretation, the jury was free to credit the expert's testimony. *Id.* ("[W]e must defer to the district court's determination that the testimony was credible enough to allow a jury to find that the act occurred."). Finally, the same messages show Holmes directing customers seeking drugs to his address (the same one he was leaving on the day of his arrest), thus allowing a

jury to infer that Holmes had completed the illicit transactions described in the texts.

All of this evidence constitutes the sort of "detailed account" of Holmes's prior wrongdoing that we have found sufficient for admission under Rule 404(b)(2).  *Id.* (finding the testimony of a single witness regarding the defendant's prior conversations regarding a murder for hire plot was sufficient evidence for a reasonable jury to conclude the plot took place).

Holmes's second argument is that the district court should have excluded the texts under Rule 403 because they were substantially more prejudicial than probative given they largely concerned marijuana sales, not the drugs at issue in this case.  This argument also fails.

We recently noted that "[a]s to the third prong, this Court repeatedly has held that evidence of prior drug dealing is highly probative of intent to distribute a controlled substance and that such evidence is not overly prejudicial." *United States v. Booker*, 136 F.4th 1005, 1014 (11th Cir.  2025).  Thus, to the extent Holmes attempts to argue undue prejudice from admission of evidence of his prior drug dealings, this argument is foreclosed by precedent where, as here, the issue of intent is contested.  *Id.*

Further, even if we accepted that a risk of undue prejudice existed, "the judge diminished the prejudicial impact of the evidence by properly instructing the jury for what purpose it was to be used." *United States v. Cardenas*, 895 F.2d 1338, 1344 (11th Cir. 1990).  The "undue prejudice" we are typically concerned about is

that a jury will improperly rely on evidence of past bad acts to determine the defendant acted consistently with "bad character." But where, as here, the district court instructs the jury that the evidence should not be used for any purpose other than proving intent, concerns about prejudice fall away, for "[w]e must presume the jury followed that instruction." *United States v. Colston*, 4 F.4th 1179, 1193 (11th Cir. 2021).

So "because of the probative value of the messages and the limiting instructions the court gave, we cannot say that [Holmes] met the heavy burden of demonstrating an abuse of discretion" in admitting the text messages. *Id.*

> D. *Special Agent Perry was a properly qualified expert permitted to testify at trial*

Holmes next argues that the district court erred in qualifying Special Agent Perry as an expert for purposes of testifying that street-level drug dealers commonly carry firearms for protection. Agent Perry's expertise, Holmes complains, "amount[s] to a broad generalization that drug dealers . . . are dangerous" which "does nothing to aid the jury in deciding that the weapon located in this case had anything to do with drug trafficking behavior." As a result, Holmes concludes, Agent Perry's testimony simply "led the jury to draw an improper conclusion": "because drug dealers are dangerous people . . . the gun in this case must have been involved with drug trafficking." Holmes also insists that "Agent Perry did not reliably apply his 'experience' in this case" and that Agent Perry's testimony "basically makes an unsupported and unreliable

assertion that some drug dealers carry weapons and so Mr. Holmes is not only a drug dealer, but also used his weapon in the furtherance of his craft."

The government responds that Agent Perry was "well qualified by virtue of his extensive experience" and helpful to the jury in demonstrating "how and why" drug dealers carry guns. We agree with the government and hold that the district court did not abuse its discretion in admitting Agent Perry's testimony.

Rule 702 of the Federal Rules of Evidence controls the admissibility of expert testimony in federal trials. Under Rule 702, expert testimony is admissible if the expert

> is qualified [] by knowledge, skill, experience, training, or education [and] (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

We have thus explained that "[b]efore a witness can testify as an expert, the party presenting his testimony must, among other things, show that the witness 'is qualified to testify competently regarding the matters he intends to address.'" *United States v. Harrell*, 751 F.3d 1235, 1243 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1260). And when an expert relies "solely or primarily on experience, then the witness must explain how that experience

leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Frazier*, 387 F.3d at 1261 (quotation omitted).

Here, the district court did not abuse its discretion in permitting Agent Perry to testify as an expert. First, as the government points out, we have held that "[t]he operations of narcotics dealers are a proper subject for expert testimony under Rule 702." *United States v. Garcia*, 447 F.3d 1327, 1335 (11th Cir. 2006) (quotation omitted). Thus, insofar as Holmes argues that Agent Perry's testimony is irrelevant or the improper subject of expert testimony, Holmes is wrong.

Second, the district court did not abuse its discretion in determining based on the evidence presented regarding Agent Perry's experience that Agent Perry's methodology and application of that methodology were reliable. The government's notice and Agent Perry's testimony explained how Agent Perry's training and experience informed his conclusion that drug dealers typically carry firearms to protect themselves and their product as part of their trade. Agent Perry's methodology was therefore relatively clear: based on a long history of experience in drug investigations, including interviewing drug dealers, Agent Perry's experience taught him that "street-level dealers have firearms . . . [b]ecause of the illegal nature [of the business] that they're dealing with . . . [t]hey want to protect themselves from other violent drug dealers" and "[t]hey don't want to get robbed and [they want] to protect their goods, their money, and their stash of drugs." Further, Agent

Perry reliably applied this methodology by explaining how it fit to the circumstances of this case.

Indeed, Agent Perry's methodology and its application in his testimony is nearly identical to testimony regarding the behavior of drug dealers that we have previously blessed. *Id.* (explaining that the qualification of "an experienced narcotics agent [to] testify as an expert to help a jury understand the significance of certain conduct or methods of operation unique to the drug distribution business" is "well-established"). Agent Perry's experience was explained in a straightforward and reliable way, and his testimony was helpful to the jury in explaining how and why a drug dealer would carry a gun with them "in furtherance" of their drug dealing scheme. *Id.* The district court therefore did not abuse its discretion by admitting Agent Perry's testimony.

### E.    *The evidence was sufficient to support Holmes's conviction*

Finally, Holmes argues that the district court erred in denying his motions under Rule 29 of the Federal Rules of Criminal Procedure[11] that the evidence was insufficient to sustain his convictions for possessing a firearm in furtherance of drug trafficking crimes in violation of 18 U.S.C. § 924(c)(1)(A)(i) and possessing a firearm and ammunition as a convicted felon in

---

[11] Holmes moved under Rule 29 for acquittal on sufficiency of the evidence grounds for all four counts before the district court. He maintains only two of those challenges here.

23-10794                Opinion of the Court                27

violation of 18 U.S.C. § 922(g)(1).[12]  He argues the government did not prove either that he possessed the firearm discovered in his car for the purpose of furthering a drug crime nor that he possessed the firearm discovered at the residence at all.  We find the evidence was more than sufficient for a reasonable jury to convict on both counts.

---

[12] Section 924(c)(1)(A) provides in relevant part as follows:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—
>
> > (i) be sentenced to a term of imprisonment of not less than 5 years;

Section 922(g)(1) states in relevant part that

> It shall be unlawful for any person--
>
> > (1) who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . . . to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

When we evaluate a Rule 29 motion for acquittal on sufficiency of the evidence grounds, "[w]e view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor, and then determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Laines*, 69 F.4th 1221, 1229 (11th Cir. 2023) (quotations omitted). Further, "[a] jury's verdict cannot be overturned if any reasonable construction of the evidence would have allowed the jury to find the defendant guilty beyond a reasonable doubt." *Id.* We thus approach Holmes's challenges asking not what we would do if we were asked to review the evidence, but rather whether there is evidence in the record that, if credited by the jury, would reasonably allow them to infer that Holmes committed the crimes of which he was accused beyond a reasonable doubt. *Id.*

Holmes's first sufficiency argument is that there was not enough evidence to convict him of a § 924(c)(1)(A) offense regarding the gun found in his vehicle shortly after his arrest. Holmes does not contest that he was in possession of that weapon, but instead argues that "[t]here was no evidence whatsoever that [he] was traveling to or from a drug deal, or in any way was committing or about to commit a drug trafficking offense at that time." Holmes also argues that Agent Perry's testimony about common practices of drug dealers was insufficient, because it was "speculative." Thus, Holmes argues, the district court erred by denying his motion for a judgment of acquittal.

Section 924(c)(1)(A) makes it a crime for "any person . . . during and in relation to any . . . drug trafficking crime . . . [to] in furtherance of any such crime, possess[] a firearm." We have held that "furtherance" in this context means "the firearm helped, furthered, promoted, or advanced the drug trafficking." *United States v. Timmons*, 283 F.3d 1246, 1252 (11th Cir. 2002). In other words, mere possession of the firearm is not enough: the evidence must show that the firearm assisted the defendant's drug trafficking in some way. *Id.*

That said, we have also clarified that there are numerous ways the government can establish the required "nexus between the firearm and the drug selling operation." *Id.* at 1253. That nexus "can be established by the type of drug activity that is being conducted, [the] accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found." *Id.* (quotation omitted). We have thus found the evidence was sufficient for a jury to infer the firearm was used in furtherance of a drug crime where the firearm was found hidden under the mattress in the same room where the drugs were being packaged, *United States v. Mercer*, 541 F.3d 1070, 1077 (11th Cir. 2008), where the firearm was intended for protection while couriers were engaged in moving drugs, *United States v. Harris*, 7 F.4th 1276, 1288 (11th Cir. 2021), and where an expert testified that the gun discovered on the defendant while he was carrying drugs

was likely used for his protection as a street-level drug dealer from rivals. *United States v. Williams*, 731 F.3d 1222, 1232 (11th Cir. 2013).

The evidence here matches cleanly with the kind of evidence we have found sufficient to support the jury's determination that a firearm was used in furtherance of drug trafficking. The government presented evidence that "Holmes was a street-level drug dealer, and those dealers often rely on firearms for personal protection," *see id.*, that Holmes "possessed his gun while traveling alone with his merchandise outside the house" even though he could not legally possess a gun at all, *see Mercer*, 541 F.3d at 1070, that the gun was right next to the drugs stored in his backpack in the passenger seat of his impounded vehicle, and that the gun was deliberately placed in a spot in his car that was easily accessible near the center console. *Id.*

Further, despite Holmes's protestations that there was "no evidence whatsoever that [he] was traveling to or from a drug deal," the jury was free to make exactly that inference from the fact that the backpack discovered in Holmes's car contained a variety of drugs in Ziplock bags and bottles, apparently packaged for sale. And while Holmes may complain that Agent Perry's testimony regarding the use of firearms by drug dealers was "speculative," it was nonetheless admissible as discussed above and thus permissible for the jury to use to infer the firearm was present in order to assist Holmes in drug trafficking. Further still, it is exactly this sort of testimony about the habitual use of firearms for protection in

furtherance of drug trafficking that we found sufficient to support a jury's verdict under the same statute in *Williams.* 731 F.3d at 1232.

A jury could reasonably infer from the evidence that Holmes possessed the gun in furtherance of a drug trafficking crime. The district court therefore did not error in denying Holmes's motion for acquittal as to his conviction under § 924(c)(1)(A).

Holmes raises slightly different arguments about the firearm found in the residence, arguing instead that the government failed to prove he possessed that firearm at all. Holmes protests that the internet search on his phone for the exact make and model of the firearm found under the mattress at the residence does not support the inference that Holmes "knew of the particular firearm under the mattress." And even if he knew of the firearm under the mattress, Holmes argues that "there is no evidence that indicates he had [the] ability to exercise dominion and control over the firearm." After all, Holmes argues, the residence "was owned by some other party, who was deceased"; "a piece of mail with a different mailing address happened to be located in the bedroom where the weapon was found"; "none of Mr. Holmes['s] personal belongings were found in the [r]esidence"; "none of the fruits of the unrelated investigation were located at the [r]esidence"; and "there were numerous individuals at the [r]esidence (none of whom were Mr. Holmes) when the search warrant was executed."

Of course, Holmes is correct that to convict a defendant of a § 922(g)(1) offense, the government must prove either actual or

(as relevant here) constructive possession of the firearm. *United States v. Perez*, 661 F.3d 568, 576 (11th Cir. 2011). To prove constructive possession of a firearm, the government must show that "the defendant (1) was aware or knew of the firearm's presence and (2) had the ability and intent to later exercise dominion and control over that firearm." *Id.*

Here, the government correctly responds that Holmes ignores some of the obvious inferences available from the circumstantial evidence against him indicating both knowledge and control of the firearm found at the residence. For example, despite Holmes's protestations, the evidence that Holmes searched on his iPhone for the exact make and model of the gun found in the residence he exited before being arrested would allow a reasonable jury to infer that Holmes "knew of the firearm's presence." *Id.* Moreover, the gun was found in a bedroom over which a jury could reasonably infer Holmes exercised dominion, as the bedroom contained mail both to and from Holmes and paperwork from his past state prosecution. Finally, the government presented evidence strongly linking Holmes to the residence itself, including that a key discovered on Holmes's person fit the lock to the house and that Holmes exited the residence on the day of his arrest. Thus, a jury could reasonably infer Holmes was aware of the firearm and exercised constructive control over it by keeping it in his personal space.

Holmes retorts that "[a]t best, this evidence establishes only that Mr. Holmes had a connection to the residence . . . generally."

But in so arguing, Holmes imposes his own gloss on the evidence, ignoring the evidence connecting him to the gun itself. *See Capers*, 708 F.3d at 1296 (explaining that when reviewing the sufficiency of the evidence, we "consider[] the evidence in the light most favorable to the [g]overnment, and draw[] all reasonable inferences and credibility choices" in the government's favor). The bottom line is that, viewing the evidence in the light most favorable to the verdict, a reasonable jury could find that Holmes possessed the firearm found in the residence beyond a reasonable doubt.

## IV.    Conclusion

Holmes's conviction is affirmed on all counts.

**AFFIRMED.**