[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11906
_____

D.C. Docket No. 4:15-cr-10009-JEM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

HARLEM SUAREZ,
a.k.a. Almlak Benitez,
a.k.a. Harlem Quintana,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 27, 2018)

Before ED CARNES, Chief Judge, WILSON, and JORDAN, Circuit Judges.

WILSON, Circuit Judge:

When the FBI arrested Harlem Suarez, he had already declared allegiance to the Islamic State of Iraq and al-Sham (ISIS), attempted to recruit others to join him in destroying the United States, and amassed weapons and a bomb in order to carry out an attack on a Key West beach.  After an eight-day trial, a jury found him guilty of attempting to use a weapon of mass destruction and attempting to provide material support to a foreign terrorist organization.  He was sentenced to life in prison without parole.  He now appeals, arguing that there was insufficient evidence for both of his convictions, and that his sentence violated the Eighth Amendment and was procedurally and substantively unreasonable.  After review, and with the benefit of oral argument, we affirm.

## I.  Background

In March of 2015, Suarez created a Facebook account under the name "Almlak Benitez."  He used it to post ISIS propaganda, to request help in building bombs, and to invite others to join him as a brother of the Islamic State.  The FBI received a tip about the Benitez profile and linked the Benitez profile to Suarez.  The FBI then used a confidential source named "Mohammed" to become Facebook "friends" with Suarez.

Suarez and Mohammed engaged in numerous Facebook, phone, and text message conversations.  During these discussions, Suarez expressed his intention to attack the United States and his desire to recruit others to join him.  He told

2

Mohammed that he had already obtained two handguns and a bulletproof vest, and that he was looking to obtain a long gun. He asked if Mohammed knew how to make bombs.

Suarez and Mohammed also met in person. During one meeting, they went to a pawn shop in Key West to pick up an AK-47 rifle that Suarez had ordered. But because Suarez had incorrectly filled out the paperwork by indicating that he was buying the gun for someone else, he was not allowed to take possession of the gun. Afterwards, the pair began to make ISIS recruitment videos. Suarez dictated the script, which Mohammed transcribed. Suarez—dressed in a black tactical vest, a black shirt, a black face mask, and a yellow and black scarf—read the script while Mohammed recorded.

In June, Mohammed introduced Suarez to another undercover FBI employee, "Shariff," who posed as a member of ISIS. Shariff claimed that he could supply explosive devices. Suarez expressed his desire to conduct multiple attacks on the Fourth of July at crowded locations and to place bombs under police cars. In July, Suarez delivered two boxes of galvanized nails, a pre-paid cellphone, a backpack, and $100 to Mohammed in order to have a bomb made. At that time, he expressed his plan to bury the bomb on a crowded beach and to detonate it with a cell phone. He also voiced his intention to place bombs under police cars, in front of police officers' homes, and in a mall.

3

Shortly thereafter, another undercover FBI employee, "Omar," called Suarez, posing as the bomb-maker. They met in person a few days later and spoke in Omar's car. Suarez asked Omar to teach him how to make a bomb; Omar replied that he would teach Suarez at some point in the future. Omar handed the completed "bomb," which was not actually operable, over to Suarez. They discussed how to operate the cellphone detonator, and Suarez exited the car with the bomb. At that point, the FBI arrested Suarez.

In post-arrest statements, Suarez told agents that he possessed three firearms—an AR-15 and two Glock handguns. He admitted that he had purchased the cellphone, backpack, and nails for the construction of the bomb, that the cellphone was to detonate the bomb, and that he planned to bury the device at the beach in Key West.

A grand jury indicted Suarez on one count of attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a(a)(2) (Count One), and one count of attempting to provide material support to a foreign terrorist organization, ISIS, in violation of 18 U.S.C. § 2339B(a)(1) (Count Two). On January 31, 2017, after an eight-day trial, the jury found him guilty on both counts. The district court sentenced Suarez to life in prison for the first count and to a concurrent twenty-year sentence for the second. Suarez timely appealed.

## II.  Discussion

### A.  Sufficiency of the Evidence

Suarez claims that the evidence was insufficient to support his conviction for attempting to use a weapon of mass destruction, in violation of 18 U.S.C. § 2332a. This statute contains a jurisdictional element—the offense, in the case of an attempt, "would have affected interstate or foreign commerce."  18 U.S.C. § 2332a(a)(2)(D).  "We review the sufficiency of evidence to support a conviction de novo, viewing the evidence in the light most favorable to the government and drawing all reasonable inferences and credibility choices in favor of the jury's verdict."  *United States v. Taylor*, 480 F.3d 1025, 1026 (11th Cir. 2007).

Citing *United States v. Lopez*, 514 U.S. 549, 115 S. Ct. 1624 (1995), Suarez argues that the government was required to prove a *substantial* effect on interstate commerce to satisfy § 2332a's jurisdictional hook.[1]  While we have not commented on the measure of evidence necessary to support the interstate commerce element of § 2332a, we have addressed this issue with respect to the Hobbs Act, which contains a similar interstate commerce element.  *United States v. Castleberry*, 116 F.3d 1384, 1387 (11th Cir. 1997).  In *Castleberry*, we held that

---

[1] In *Lopez*, the Supreme Court held that when Congress is not regulating a commercial activity and when the statute does not contain a jurisdictional hook requiring the regulated activity to be connected in some way to interstate commerce, we ask whether the regulated activity "substantially affects" interstate commerce. *See United States v. Castleberry*, 116 F.3d 1384, 1387 (11th Cir. 1997).

statutes containing separate interstate commerce elements were unaffected by *Lopez*, and that the government only had to prove a minimal—not substantial— effect on interstate commerce. *Id*. Other circuits have directly applied Hobbs Act jurisprudence to determine that "a de minimis effect on interstate commerce" satisfies the jurisdictional requirement of § 2332a. *United States v. Mann*, 701 F.3d 274, 295 (8th Cir. 2012); *see also United States v. Davila*, 461 F.3d 298, 306– 07 (2d Cir. 2006). We reach the same conclusion here. Because § 2332a contains a jurisdictional element, the government need only show a minimal effect on interstate commerce to support § 2332a jurisdiction.

The minimal effect standard is a low bar. Looking again to our Hobbs Act cases for guidance, we have found interstate commerce affected where a bank robbery led to the shutdown of a bank for an afternoon, *United States v. Dean*, 517 F.3d 1224, 1228 (11th Cir. 2008), where a service station that sold out-of-state goods was robbed and closed for two hours, *United States v. Guerra*, 164 F.3d 1358, 1361 (11th Cir. 1999), and where motels which served out-of-state guests were robbed, *United States v. Rodriguez*, 218 F.3d 1243, 1245 (11th Cir. 2000) (per curiam). And in the § 2332a context, the Eighth Circuit has found that a bomb targeted at one doctor affected interstate commerce because it depleted the assets of the victim's clinic, which did business in interstate commerce. *Mann*, 701 F.3d at 296.

Here, the government presented sufficient evidence to show that a terrorist bombing in Key West would have had at least a minimal effect on interstate commerce. The government's main witness was Edwin Swift, the president of a tour company that operates multiple businesses and institutions in Key West, Boston, and Washington, D.C. He was also a former county commissioner and president of the local Chamber of Commerce in Key West. Drawing on his professional experience of the effects on tourism businesses in Washington, D.C. and Boston in the wake of 9/11 and the Boston Marathon bombing, Swift testified that a terrorist attack would have caused severe damage to Key West's tourism-driven economy. A reasonable jury could find at least a minimal effect on interstate commerce based on this testimony.

Suarez also claims that the evidence was insufficient to support his conviction for attempting to provide material support to a foreign terrorist organization in violation of 18 U.S.C. § 2339B. Section 2339B prohibits "knowingly provid[ing] material support or resources to a foreign terrorist organization, or attempt[ing] or conspir[ing] to do so." *Id.* § 2339B(a)(1). "Material support or resources" means "any property . . . or service, including currency . . ., training, expert advice or assistance . . ., weapons . . ., explosives, [and] personnel (1 or more individuals who may be or include oneself)." 18 U.S.C. § 2339A(b). "A defendant is guilty of attempt when (1) he has a specific

7

intent to engage in the criminal conduct for which he is charged and (2) he took a substantial step toward commission of the offense." *United States v. Jockisch*, 857 F.3d 1122, 1129 (11th Cir. 2017).

Here, the government provided substantial evidence showing that Suarez knowingly provided material support to ISIS, a designated foreign terrorist organization. Through his Facebook account, Suarez posted ISIS propaganda, requested help in building bombs, attempted to recruit others to join him in attacks, and filmed a recruitment video to this end. *Cf. United States v. Augustin*, 661 F.3d 1105, 1121 (11th Cir. 2011) (per curiam) ("A jury could find that by volunteering his service to Al Qaeda—whether for financial or other reasons—Augustin conspired to provide material support to a foreign terrorist organization in violation of § 2339B."). He coordinated directly with individuals whom he believed to be members of ISIS in order to acquire a bomb. He provided the money and materials for the bomb, and he accepted the bomb while reiterating his plan to detonate it on a crowded beach. On this basis, a reasonable jury could conclude that Suarez attempted to direct his services to the benefit of a foreign terrorist organization.

Suarez argues that there was no coordination or direct contact with an actual foreign terrorist organization because he had contact only with the government informant and undercovers. But it is irrelevant that he did not make contact with ISIS, because the law requires only that Suarez directed (or attempted to direct) his

8

services to ISIS. And Suarez's mistaken belief that the government informant and undercovers were actual ISIS members is not a defense to his attempted crime. *See United States v. Williams*, 553 U.S. 285, 300, 128 S. Ct. 1830, 1843 (2008) ("[I]mpossibility of completing the crime because the facts were not as the defendant believed is not a defense."). Suarez had the requisite intent to coordinate with ISIS and direct his services to ISIS, and he took substantial steps to do so. Accordingly, there was sufficient evidence to convict Suarez for attempting to provide material support to a foreign terrorist organization and for attempting to use a weapon of mass destruction.

B. Sentencing Issues

We turn next to Suarez's sentencing claims. He argues that his life sentence (1) violated the Eighth Amendment, (2) was procedurally unreasonable, and (3) was substantively unreasonable. We address each argument in turn.

1. Eighth Amendment

First, Suarez argues that his life sentence without parole violated the Eighth Amendment's prohibition against cruel and unusual punishment. Because Suarez did not make this argument before the district court, we review it for plain error. *United States v. Flanders*, 752 F.3d 1317, 1342 (11th Cir. 2014). Plain error review requires that there is an error, it is plain, and it affects substantial rights. *United States v. Knowles*, 66 F.3d 1146, 1157 (11th Cir. 1995).

Outside the context of capital punishment cases, "the Eighth Amendment encompasses, at most, only a narrow proportionality principle." *Flanders*, 752 F.3d at 1342. First, we determine whether the sentence is "grossly disproportionate to the offense committed." *Id.* "If we find that it is, we then consider sentences imposed on others convicted of the same crime." *Id.* Successful Eighth Amendment challenges in non-capital cases are "exceedingly rare." *Id*. (affirming life-without-parole sentence for sex trafficking); *see also Harmelin v. Michigan*, 501 U.S. 957, 111 S. Ct. 2680 (1991) (affirming life-without-parole sentence for possession of cocaine). Indeed, it appears we have never held that a non-capital sentence for an adult has violated the Eighth Amendment.

Suarez argues that his age, low intellect, lack of maturity, and gullibility raise the same culpability questions the Supreme Court addressed in *Graham v. Florida*, 560 U.S. 48, 130 S. Ct. 2011 (2010). But *Graham*'s rationale leads us to the opposite conclusion. *Graham* held that a juvenile cannot constitutionally be sentenced to life without the possibility of parole for a non-homicide offense. *Id*. at 812, 130 S. Ct. at 2034. That holding was motivated by distinctions the Supreme Court "perceived between juvenile and adult offenders, including the decreased culpability—and increased capacity for rehabilitation—of juveniles." *United States v. Mathurin*, 868 F.3d 921, 931 (11th Cir. 2017). But Suarez is not a

10

juvenile—he was 24 when he attempted the terrorist attack. *Graham* also recognized "that defendants who do not kill, intend to kill, or foresee that life will be taken are categorically less deserving of the most serious forms of punishment." *Graham*, 560 U.S. at 69, 130 S. Ct. at 2027. Again, here we have the opposite. Suarez intended to kill as many people as possible by exploding a bomb on a Key West beach. Suarez's life sentence was not so disproportionate to his crimes that, under plain error review, it would be considered cruel and unusual under the Eighth Amendment.

### 2. Procedural Reasonableness

Second, Suarez claims that his sentence is procedurally unreasonable because the application of the § 3A1.4 terrorism enhancement constituted impermissible double counting of the Sentencing Guidelines. Suarez failed to argue procedural unreasonableness below, and so we review for plain error. *Flanders*, 752 F.3d at 1342.

Suarez was sentenced under U.S.S.G. § 2M6.1, which applies a base offense level of 42 "if the offense was committed with intent (A) to injure the United States; or (B) to aid a foreign nation or a foreign terrorist organization." *Id.* § 2M6.1(a)(1). The district court applied a § 3A1.4 enhancement for "Terrorism," which applies if "the offense is a felony that involved, or was intended to promote, a federal crime of terrorism." The enhancement increased Suarez's offense level

11

by 12 and set his criminal history category to VI.  *See id.* § 3A1.4(a)–(b).  His offense level was then capped at 43 as required by the Guidelines.  *See id.* § 5A cmt. n.2.

"Impermissible double counting occurs only when one part of the Guidelines is applied to increase a defendant's punishment on account of a kind of harm that has already been fully accounted for by application of another part of the Guidelines."  *United States v. Dudley*, 463 F.3d 1221, 1226–27 (11th Cir. 2006).  "Double counting a factor during sentencing is permitted if the Sentencing Commission . . . intended that result and each guideline section in question concerns conceptually separate notions relating to sentencing."  *Id.* at 1227 (alteration in original).  "We presume that the Sentencing Commission intended separate guidelines sections to apply cumulatively, unless specifically directed otherwise."  *Id.* (internal quotation marks omitted); *see also* U.S.S.G. § 1B1.1 cmt. n.4(B) (stating that absent an instruction to the contrary, enhancements under Chapter Two and adjustments under Chapter Three "are to be applied cumulatively").  The application of multiple guidelines sections can be "triggered by the same conduct."  U.S.S.G. § 1B1.1 cmt. n.4(B).

Here, applying plain error review, we cannot say that there was any double counting.  The two guidelines at issue serve different sentencing considerations.  *See United States v. Volpe*, 224 F.3d 72, 76 (2d Cir. 2000) (concluding that

12

impermissible double counting does not occur where adjustments "address separate sentencing considerations").  Section 2M6.1 addresses the attempted use of dangerous materials with the intent to injure the United States or to aid a foreign nation or a foreign terrorist organization.  Section 3A1.4 enhances the sentence for an offense that involved, or was intended to promote, a federal crime of terrorism.  A federal crime of terrorism is an offense that "is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct," 18 U.S.C. § 2332b(g)(5), and is listed in 18 U.S.C. § 2332b(g)(5)(B).  These are conceptually distinct considerations that account for different harms.  It is irrelevant that these adjustments will often be triggered by the same conduct.  Indeed, Congress and the Sentencing Commission intended the terrorism enhancement to apply to Suarez's crime.  The definition of a federal crime of terrorism in § 3A1.4, by incorporating § 2332b(g)(5), specifically includes a conviction under 18 U.S.C. § 2332a, the weapons of mass destruction crime for which Suarez was convicted.  Accordingly, we affirm the procedural reasonableness of Suarez's sentence.

### 3.  Substantive Reasonableness

Finally, Suarez claims that his sentence was substantively unreasonable.  He argues that the district court gave too much weight to what might have happened; did not properly weigh the fact that Suarez was a young, immature first-time

13

offender; and did not appropriately consider the fact that nobody was injured and that there was no real risk of anyone getting injured.

We review the substantive reasonableness of a sentence for abuse of discretion. *United States v. Blake*, 868 F.3d 960, 978 (11th Cir. 2017). "A district court abuses its discretion when it (1) fails to afford consideration to relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors." *Id.* The proper factors for the district court to consider are set out in 18 U.S.C. § 3553(a). *Id.*

Given all of the facts and circumstances, Suarez's life sentence is not unreasonable. The district court applied the guideline-recommended sentence and considered the § 3553(a) factors at sentencing. Suarez contests the district court's focus on what could have happened, instead of what actually happened. But that is exactly what the district court was required to do. Suarez was convicted of attempt offenses. To "deviate a sentence downward on the basis of unrealized harm is to require an act of completion for an offense that clearly contemplates incomplete conduct." *United States v. Jayyousi*, 657 F.3d 1085, 1118 (11th Cir. 2011) (alteration adopted). Further, the district court concluded that the seriousness of the crime and Suarez's potential future threat to the public—given the likelihood of him maintaining his radical beliefs—outweighed his lower intelligence and lack of

14

criminal history.  This was well within the district court's discretion.  *See United States v. Shaw*, 560 F.3d 1230, 1237 (11th Cir. 2009) (stating that a district court is permitted to attach "great weight" to one factor over others).  Accordingly, we affirm the substantive reasonableness of Suarez's sentence.

### III.  Conclusion

Suarez's convictions and sentence are affirmed.

**AFFIRMED**.