**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-10041

————————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

KRYSTAL DIANE PINKINS,

*Defendant-Appellant.*

————————————————

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 1:22-cr-00417-RDP-NAD-1

————————————————

2                    Opinion of the Court                    24-10041

Before JORDAN, NEWSOM, Circuit Judges, and HONEYWELL,* District Judge.

PER CURIAM:

Krystal Pinkins was convicted of aiding and abetting the August 2022 felony murder of Adam Simjee.  Simjee was shot and killed by Yasmine Hider during a robbery and attempted carjacking of him and his girlfriend in the Talladega National Forest.  After Hider testified against Pinkins at trial, Pinkins was found guilty of the following charges under an aiding and abetting theory: felony murder under 18 U.S.C. §§ 1111 (Count 1), robbery under 18 U.S.C. § 2111 (Count 3), and the use of a firearm during and in relation to a crime of violence that caused death under 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1) (Count 4).  Pinkins was sentenced to concurrent terms of life without the possibility of parole.

On appeal, Pinkins argues that the government presented insufficient evidence to support an aiding and abetting theory under any of the counts.  In the alternative, she contends that the robbery conviction must be vacated on double jeopardy grounds, because it is a lesser included offense of the felony murder conviction.  Third, Pinkins argues that the district court erred in denying her *Batson*[1] challenge.  Fourth, she challenges the admission of photographs depicting religious objects in Pinkins' and Hider's campsite.

---

* Honorable Charlene Edwards Honeywell, United States District Judge for the Middle District of Florida, sitting by designation.

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986).

Lastly, Pinkins argues that her life sentences constitute cruel and unusual punishment in violation of the Eighth Amendment.

After reviewing the briefs and the record, and with the benefit of oral argument, we affirm Pinkins' convictions and sentence.

## I.

We set out the evidence presented at trial in the light most favorable to the government, *see United States v. Smith*, 821 F.3d 1293, 1296 (11th Cir. 2016), and then summarize the relevant procedural history.

## A.

In the spring of 2022, Krystal Pinkins invited Yasmine Hider to live "off the grid" with Pinkins and her five-year-old son at a campsite in Alabama's Talladega National Forest. Pinkins had been living at the campsite with her son, her boyfriend, and another man until March, when her boyfriend went missing and the group disbanded. She then went to Atlanta and reconnected with Hider, whom she had met through a mutual friend the previous fall. Hider was 20 years old and Pinkins was 36. Hider looked up to Pinkins, and they referred to each other as sisters.

Hider, Pinkins, and Pinkins' son arrived at the campsite in late May. They brought Pinkins' car, a Toyota Scion, and supported themselves using Hider's food stamps and some money that Pinkins' father would send. The campsite was about a half mile from the main road.

The group ran into trouble in July after the Scion was vandalized and became inoperable. Without a car, Pinkins and Hider were unable to reach a store that accepted food stamps. They also had no luck hitchhiking to town. And eventually, the food supply started to run low.

In early August, Pinkins and Hider discussed the need to take a car without permission so they could get to a store. Because they did not know how to hotwire a car, Hider came up with the idea to take one by force. Hider shared her carjacking plan with Pinkins, and, although Hider was the one to initiate every conversation, the two of them discussed the plan together, including where they would go once they had the car and how to avoid being caught when they were done with it.

Pinkins owned a pistol, which she had taught Hider to use a few weeks earlier. She also owned a shotgun. On August 12, she gave Pinkins the pistol. Hider testified that Pinkins gave it to her so that Hider could carjack someone, as they had discussed. Pinkins, on the other hand, maintained in her statement to police that she gave Hider the gun for Hider's protection while Hider tried to find a ride to the store. But Pinkins acknowledged that Hider had told her Hider might use the gun to take a car by force if she needed to. Although Pinkins claimed she did not take Hider seriously, she knew it was possible Hider meant what she said, because hungry people can do desperate things. According to Pinkins, she told Hider that Pinkins could not be involved in a carjacking because she had a child to consider.

On the evening of August 12, carrying Pinkins' gun in her backpack, Hider went to the main road a little ways from where the Scion was parked. She started flagging down passersby to ask them for a jump, despite her knowledge that jumping the battery would not start the car. Two men attempted, unsuccessfully, to jump the Scion. They then invited Hider to their group's campsite to share their dinner instead. Pinkins declined the offer when Hider told her about it, and neither of them went—even though Hider wanted to go, and they had not eaten in two days.

Hider tried again the next day. Although a man who attempted to jump the Scion offered her a ride to the store, she was too nervous to get into his car or to try to take it from him. Pinkins agreed to hide in the woods nearby to build Hider's confidence after the second failed attempt; but even with her there, Hider was still unable to take a car for the rest of the day.

At Hider's request, Pinkins hid in the woods again when Hider went back out on August 14. Pinkins did not bring her shotgun. She told police that she stayed in the woods so the people Hider stopped would not be intimidated by the presence of an additional person, and because she did not want to be involved if the encounter went wrong.

Hider flagged down Adam Simjee and Mikayla Paulus in the late morning. She said she needed a jump, and they followed her in their van to the place where the Scion was parked. Simjee and Paulus spent about an hour trying to start the car, even calling Paulus' father for advice and watching YouTube video tutorials.

Listening in the woods, Pinkins claimed she believed they would be successful in fixing the car and Hider would not have to use the gun.

When Simjee and Paulus concluded they could not fix the car, however, Hider pulled out the gun. She directed them to walk into the woods and empty their pockets. Paulus placed her phone and the keys to the van on the ground. After obtaining Paulus' phone password, Hider used the phone to record audio while she demanded Paulus' and Simjee's credit card pin numbers and banking passwords. Hider then became distracted, giving Simjee the chance to pull out a gun from his waistband and the two both started shooting at each other.

Simjee was fatally shot. Hider fell and broke her leg, and she called out to Pinkins for help. Pinkins appeared after a few moments, then said to Hider "What do you want me to do? I don't have anything on me," and fled. She was apprehended at the campsite with her son later that afternoon.

**B.**

A grand jury indicted Pinkins on one count of aiding and abetting another who committed felony murder, one count of kidnapping, one count of robbery, and one count of using a firearm in relation to a crime that caused death.

The case went to trial in September 2023. During jury selection, Pinkins made a *Batson* challenge to the government's exercise

of a preemptory strike on potential juror T.F.  T.F. was the only Black woman on the panel, and Hider and Pinkins are both Black. The government explained that it had struck T.F. because she indicated she had been a victim of domestic violence, as had Pinkins. The government cited Pinkins' relationship with her child's father, as well as a "dysfunctional situation" Pinkins had been in at the campsite with "two Black males"—Pinkins' ex-boyfriend and the other man in their group—before she met Hider. Although Pinkins pointed out that the government's explanation had included an irrelevant reference to race, the district court credited it. The court found that a shared history of domestic violence between Pinkins and T.F. was a legitimate basis to consider when exercising preemptory strikes.  Accordingly, it denied Pinkins' *Batson* challenge.

After the government rested its case, Pinkins moved, unsuccessfully, for a judgment of acquittal.  The defense did not put on a case.  The jury then found Pinkins guilty on all charges except for Count 2, kidnapping.

At sentencing, Pinkins objected to the mandatory minimum sentence of life without parole for her conviction of murder in the first degree, pursuant to 18 U.S.C. § 1111(b). She argued that it constituted cruel and unusual punishment because she was convicted of aiding and abetting a felony murder, where there was no evidence that she caused or intended to cause a death.  Pinkins also requested a mitigating role reduction that the court rejected.

In overruling Pinkins' sentencing objections, the district court made several observations about the trial evidence that the court believed contributed to the jury's verdict: (1) it was Pinkins' car that "was used as a prop to cause an unsuspecting victim to pull over and help…even though Pinkins knew and Hider knew that it could not be repaired by a [ ] passerby in a car"; (2) Pinkins supplied the gun to Hider two or three days before the shooting, after the two discussed using it to carjack someone; (3) Pinkins left her young son alone at the campsite instead of bringing him with her to garner sympathy from passersby, suggesting that she intended to keep him away from the carjacking scene; and (4) Pinkins failed to render assistance to either Hider or Paulus after the shooting, instead choosing to flee.  The court also found that Pinkins was the "dominant personality…in terms of the power of the relationship" with Hider.  In all, the court stated that it believed the evidence indicated Pinkins was "equally culpable" in the offense.

For Count 1, felony murder, Pinkins received the mandatory minimum sentence of life without the possibility of parole. For Count 3, robbery, the district court sentenced her to a concurrent sentence of fifteen years.  For Count 4, the use of a firearm during a crime of violence that caused death, Pinkins received a concurrent term of life without parole.

## II.

### A.

Pinkins' first argument on appeal is that the district court erred in denying her motions for judgment of acquittal, because the evidence was insufficient to establish that she aided and abetted Hider with regard to any count. Pinkins emphasizes that she did not give Hider any assistance during the robbery, she was unarmed while waiting in the woods, and Hider's own testimony establishes that Hider was the one who came up with the idea of taking a car by force and who initiated every conversation on the topic. Although Pinkins gave Hider the gun—days before the shooting—she argues there was insufficient evidence Pinkins was aware that Hider would use it during a carjacking, rather than for Hider's own protection.

Whether there is sufficient evidence to support a conviction is a question of law that we review *de novo*. However, we must "view the evidence in the light most favorable to the government, making all reasonable inferences and credibility choices in the government's favor, and then determine whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *United States v. Holmes*, 141 F.4th 1183, 1199 (11th Cir. 2025) (quotation omitted). Thus, when we evaluate a motion for judgment of acquittal on sufficiency grounds, we ask whether there is evidence on the record that, if credited by the jury, would reasonably allow them to infer that the defendant committed the crimes beyond a reasonable doubt. *See id.*

A person who "aids, abets, counsels, commands, induces or procures" the commission of an offense, or who willfully causes it

to be done, is "punishable as a principal" for that offense. 18 U.S.C. § 2. Under an aiding and abetting theory of guilt, "the acts of the principal become those of the aider and abettor as a matter of law." *In re Colon*, 826 F.3d 1301, 1305 (11th Cir. 2016) (citation omitted). A defendant need not participate in each element of the offense to be found guilty of aiding and abetting. *See U.S. v. Arias-Izquierdo*, 449 F.3d 1168, 1176 (11th Cir. 2006). Rather, liability as a principal for aiding and abetting requires only: (1) the commission of an affirmative act in furtherance of the offense, (2) with intent to facilitate its commission. *See Rosemond v. United States*, 572 U.S. 65, 71 (2014). "[The] 'intent requirement' for aiding and abetting a federal crime is 'satisfied when a person actively participates in a criminal venture with full knowledge of the circumstances constituting the charged offense.'" *Bourtzakis v. U.S. Attorney General*, 940 F.3d 616, 623 (11th Cir. 2019) (emphasis in original) (quoting *Rosemond*, 572 U.S. at 77). The affirmative act element "comprehends all assistance rendered by words, acts, encouragement, support, or presence." *U.S. v. Roosevelt Coats*, 8 F.4th 1228, 1248 n.10 (11th Cir. 2021) (quoting *Rosemond*, 572 U.S. at 73).

Sufficient evidence supports Pinkins' convictions. The jury reasonably could have credited Hider's testimony that she and Pinkins discussed the carjacking plan, that Pinkins gave Hider the gun to further it, and that Pinkins came to the woods to support Hider while it occurred. To the extent Pinkins' statement to police conflicted with Hider's testimony, a reasonable jury may have chosen not to credit Pinkins' account. Even if they did, however, they may have considered Pinkins' admissions that Hider told her she

planned to use Pinkins' gun to take a car, and that Pinkins wanted to stay out of sight so she would not be held responsible if that occurred. Pinkins was, perhaps, unaware of the "centuries-old view of culpability: that a person may be responsible for a crime he has not personally carried out if he helps another to complete its commission." *Rosemond*, 572 U.S. at 70. As a result, even if the jury agreed with Pinkins that her participation in the offenses was "not merely partial but minimal too," *Rosemond*, 572 U.S. at 73, there remains sufficient evidence to support its conclusion that she committed an affirmative act or acts in furtherance of the offenses with intent to aid in their commission.

With respect to the violation of 18 U.S.C. § 924(c), Pinkins argues that the government failed to present sufficient evidence that Pinkins knew Hider had the gun during the encounter with Simjee and Paulus. Pinkins relies on the Supreme Court's holding in *Rosemond*, 572 U.S. at 70, which involved a § 924(c) violation that occurred during a drug transaction in which the defendant participated. The *Rosemond* court concluded that a participant in a crime has the intent needed to aid and abet a § 924(c) violation when, *inter alia*, he has advance knowledge "of a confederate's design to carry a gun[.]" *Id.* at 78. "In such a case, the accomplice has decided to join in the criminal venture, and share in its benefits, with full awareness of its scope—that the plan calls not just for a drug sale, but for an armed one." *Id.* at 77–78.

Here, contrary to Pinkins' arguments, it was reasonable for the jury to find that Pinkins had advance knowledge that Hider

intended to use the gun during a robbery or carjacking. Both Hider and Pinkins agreed that Hider told Pinkins she intended to use the gun if necessary, and Hider testified that Pinkins gave her the gun so that Hider could carry out the carjacking plan. And, although Hider did not use the gun until two days later, she spent the intervening time making unsuccessful attempts while trying to work up the nerve to use it. Hider testified that she told Pinkins on the second day that she felt like she had failed Pinkins, but that she would try harder; she then asked Pinkins to come with her when she tried again because then she might have a better chance of "taking a car, having more confidence to do it," and using the gun, if necessary. Unlike in *Steiner v. United States*, 940 F.3d 1282 (11th Cir. 2019), on which Pinkins also relies, the evidence that she had advance knowledge of the gun was far from "thin." *Id.* at 1291.

Thus, sufficient evidence supports the jury's determination that Pinkins aided and abetted Hider as to all three counts.

### B.

Pinkins next contends that the district court committed plain error because her convictions violate the Double Jeopardy Clause. Because robbery was the underlying felony for her felony murder conviction, she argues that it was unconstitutional to convict her of both robbery and felony murder.

Where a double jeopardy claim was not raised before the district court, we review it only for plain error. *See United States v. Bobb*, 577 F.3d 1366, 1371 (11th Cir. 2009). "Under the plain error

standard, we will affirm the district court unless: (1) there was an error in the district court proceedings; (2) the error was plain; and (3) the error affected the defendant's substantial rights." *Id.* If these conditions are met, we may exercise our discretion and vacate the conviction if the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See id.*

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Therefore, a court violates double jeopardy when it imposes multiple punishments for the same offense. *See Brown v. Ohio*, 432 U.S. 161, 165 (1977).

To determine whether convictions under different statutes for the same act or transaction violate double jeopardy, the Supreme Court has established the "same elements" test: "whether each [statutory] provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). If not, "they are the 'same offence' and double jeopardy bars additional punishment[.]" *United States v. Dixon*, 509 U.S. 688, 696 (1993).

We have observed that, "[a]s a general proposition, when a defendant has violated two different criminal statutes, the Double Jeopardy Clause is implicated . . . when one act is a lesser included offense of the other." *Bobb*, 577 F.3d at 1371. The Supreme Court applied this principle to felony murder in *Harris v. Oklahoma*, 433 U.S. 682, 682 (1977):

> When, as here, conviction of a greater crime, murder,
> cannot be had without conviction of the lesser crime,
> robbery with firearms, the Double Jeopardy Clause
> bars prosecution for the lesser crime, after conviction
> of the greater one.

Thus, convictions for both felony murder and the felony on which the felony murder conviction is based will be found to violate double jeopardy, unless there is a "clear indication that the legislature intended multiple punishments for the same offense." *Bobb*, 577 F.3d at 1371-72.[2]

Here, the jury returned a verdict of guilty under Count 1, felony murder, and Count 3, robbery, and the district court imposed a sentence for each offense. Although the indictment alleged underlying felonies of both kidnapping and robbery for Count 1, the jury acquitted Pinkins of kidnapping. Therefore, Pinkins argues, her convictions of both felony murder and its lesser included offense violate double jeopardy.

Pinkins asserts that she is entitled to vacatur of the robbery conviction because the lack of specificity means there is no guarantee the jury found her guilty of robbing Paulus rather than Simjee alone. For Pinkins to succeed on plain error review, however, we must find that the purported error is clear or obvious and that it

---

[2] We have found, for example, that convictions for both felony murder and the underlying felony in Florida state court do not violate double jeopardy, because the Florida legislature expressly indicated its intent to impose multiple punishments when both a murder and a felony occur in a single criminal episode. *Fallada v. Dugger*, 819 F.2d 1564, 1572–73 (11th Cir. 1987).

affected her substantial rights. *See United States v. Olano*, 507 U.S. 725, 734 (1993). Pinkins' speculation does not satisfy this standard. *See United States v. Rodriguez*, 398 F.3d 1291, 1301 (11th Cir. 2005) ("[W]here the effect of an error on the result in the district court is uncertain or indeterminate—where we would have to speculate— the appellant has not met his burden of . . . showing that his substantial rights have been affected.").

Pinkins has not established plain error under the circumstances of this case because even if there was an error, she has not established that the purported error affected her substantial rights. "For an error to affect a defendant's substantial rights, he must show that the error caused him prejudice, which requires that there be a reasonable probability of a different result if the error had not been committed." *United States v. Deason*, 965 F.3d 1252, 1268 (11th Cir. 2020).

Although convictions for felony murder and the robbery of a *single* victim might violate double jeopardy, the indictment against Pinkins names both Simjee and Paulus as victims of the robbery. As Pinkins concedes, a double jeopardy violation exists only if the robbery conviction related to the same victim as the felony murder predicate. Neither the indictment, the verdict form, nor the jury instructions specified whether the jury should separate its conclusions as to Simjee and Paulus. But the trial evidence indicated that Hider took or attempted to take property from each victim: Paulus' phone, the keys to Simjee's van, and both victims' bank account information. There was ample evidence from which

the jury could have found Pinkins guilty of aiding and abetting the robbery of Paulus, and aiding and abetting felony murder based on the robbery of Simjee—or aiding and abetting the robbery of Simjee, and aiding and abetting felony murder based on the robbery of Paulus—thereby avoiding a double jeopardy violation.[3]

## C.

---

[3] Pinkins also argues, in passing, that the robbery count's failure to differentiate between Paulus and Simjee creates a "unanimity problem," because it is unclear whether the jury came to a unanimous conclusion regarding the victim's identity. The Sixth Amendment right to a jury trial requires a unanimous verdict to convict a defendant of a serious offense. *See Ramos v. Louisiana*, 590 U.S. 83 (2020). Pinkins speculates that the jury may not have been unanimous as to the victim they were finding Pinkins guilty of robbing. But as mentioned, speculation is not enough on plain error review. *See Rodriguez*, 398 F.3d at 1301; *see also Deason*, 965 F.3d at 1268.

Pinkins' contention invokes the concept of duplicity, which is "the joining in a single count of two or more distinct and separate offenses." *United States v. O'Steen*, 133 F.4th 1200, 1206 n.10 (11th Cir. 2025). A duplicitous indictment carries a risk that the jury convicted without reaching a unanimous agreement as to either crime. *See id.* But Pinkins did not raise the issue of a duplicitous indictment at trial, when it could have been addressed and resolved. Nor does she squarely present this argument for our review on appeal. As in *Deason*, Pinkins has failed to show that she would be better off if the jury considered separate robbery offenses for each victim, since she does not offer a "serious argument that [s]he is innocent" of robbing one of them. *Deason*, 965 F.3d at 1268. Based on the unrefuted evidence of Hider's actions, no reasonable juror could have found that only one of them, Paulus or Simjee, was a robbery victim. As Pinkins has not established that her substantial rights were affected by a duplicitous robbery count, the district judge did not commit plain error on double jeopardy grounds.

Next, Pinkins argues that the district court erred in denying her *Batson* challenge.

The Equal Protection Clause prohibits litigants from exercising peremptory strikes based on a juror's race. *See Batson v. Kentucky*, 476 U.S. 79, 89 (1986). A *Batson* challenge to the use of peremptory strikes initiates a three-step inquiry. *See United States v. Walker*, 490 F.3d 1282, 1291 (11th Cir. 2007). First, the party raising the challenge must make a prima facie showing that the peremptory strike was exercised due to race. *See id.* Second, the non-moving party must provide a race-neutral basis for striking the juror. *See id.* Notably, "almost any plausible reason can satisfy the striking party's burden," even if the reason is "superstitious, silly, or trivial," as long as it is race- and gender-neutral. *Id.* at 1293. The district court is then charged with determining, based on all relevant circumstances, whether the moving party has shown purposeful discrimination. *See id.* at 1291; *see also United States v. Robertson*, 736 F.3d 1317, 1325 (11th Cir. 2013). The third step requires an assessment of an attorney's credibility that involves "pure factfinding". *Walker*, 490 F.3d at 1291. As a result, it is entitled to a "high degree of deference" on appeal. *United States v. Simmons*, 122 F.4th 1256, 1265 (11th Cir. 2024). Accordingly, the district court's ruling on a *Batson* challenge is reviewed only for clear error. *See Robertson*, 736 F.3d at 1324.

Here, the district court determined that Pinkins had established the first step of a *Batson* challenge when she objected to the government striking the only Black woman in the jury panel. The

government then offered a race-neutral explanation: that T.F. might sympathize with Pinkins because they were both victims of domestic violence.  In the third step of the *Batson* analysis, the district court credited the government's rationale and determined that there was no purposeful discrimination.  It did not clearly err in doing so.  Despite the government's irrelevant reference to race at the beginning of its response, it went on to identify a non-racial reason that differentiated T.F. from the rest of the panel, contrary to Pinkins' arguments on appeal.  "[W]e do not view a party's failure to strike similarly situated jurors as pretextual when relevant differences exist between them." *United States v. Hughes*, 840 F.3d 1368, 1382 (11th Cir. 2016) (citation and internal quotation marks omitted).  Affording great deference to the district court's assessment of the government's credibility, as we must, we find no clear error in its denial of Pinkins' *Batson* challenge.

### D.

Pinkins next challenges the district court's admission of three photographs depicting objects in Pinkins' and Hider's campsite that appear to be associated with the occult.  Pinkins objected to the photos as irrelevant and more prejudicial than probative, in that they depicted non-mainstream religious beliefs.  The district court found that the photos were relevant to show that Pinkins and Hider shared religious beliefs, which demonstrated the influence Pinkins exercised over Hider.

We review evidentiary rulings for an abuse of discretion. *See United States v. McGregor*, 960 F.3d 1319, 1323 (11th Cir. 2020). Under this deferential standard, we will not reverse an evidentiary decision of the trial court unless the ruling is "manifestly erroneous." *Id.* (quoting *United States v. Frazier*, 387 F.3d 1244, 1258 (11th Cir. 2004) (en banc)). Moreover, we afford the trial court "the broadest discretion in determining whether evidence should be excluded under Rule 403." *United States v. Costa*, 947 F.2d 919, 924 (11th Cir. 1991) (citation omitted). Rule 403 of the Federal Rules of Evidence allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.

Here, the district court did not abuse its broad discretion in determining that the photos had some probative value regarding the relationship between Pinkins and Hider, which was central to the government's theory of accomplice liability at trial. To address Pinkins' concern about prejudice, the court reasonably offered a limiting instruction, which Pinkins declined. Although Pinkins now contends that the government's failure to make any argument about the photos prejudiced her because it left the jury to speculate about their meaning, the government was abiding by the district court's prudent admonition against "piling on" or focusing on the photos more than their limited relevance warranted.

In any event, any error in the photos' admission was harmless. An error is considered harmless if the court determines, "after pondering all that happened without stripping the erroneous

action from the whole, that the judgment was not substantially swayed by the error." *United States v. Gamory*, 635 F.3d 480, 492 (11th Cir. 2011) (quoting *Kotteakos v. U.S.*, 328 U.S. 750, 765 (1946)). Here, the government did not elicit testimony about the photos Pinkins objected to or reference them in its closing argument. The three photos she objected to were admitted alongside dozens of others. In view of the ample evidence supporting the jury's determination, we cannot say that it was substantially swayed by the photos' admission.

### E.

Finally, Pinkins raises an as-applied challenge to her concurrent sentences of life without parole, claiming that they violate the Eighth Amendment because they are grossly disproportionate to her offense.

The Eighth Amendment prohibits the infliction of cruel and unusual punishment. *See* U.S. Const. amend. VIII. However, "[i]n noncapital cases, the Eighth Amendment encompasses, at most, only a narrow proportionality principle." *United States v. Brant*, 62 F.3d 367, 368 (11th Cir. 1995). Successful challenges to the constitutionality of noncapital sentences are "exceedingly rare." *Solem v. Helm*, 463 U.S. 277, 289-90 (1983). Indeed, this Court has never found that a noncapital sentence of an adult violates the Eighth Amendment. *See United States v. Suarez*, 893 F.3d 1330, 1336 (11th Cir. 2018).

To assert that a noncapital sentence is cruel and unusual, the defendant must make a threshold showing that the sentence is grossly disproportionate to the offense committed. *See Brant*, 62 F.3d at 368. This requires a court to "compar[e] the gravity of the offense and the severity of the sentence." *Graham v. Florida*, 560 U.S. 48, 60 (2010). If the defendant makes this showing, the court will then consider sentences imposed on other defendants in the same jurisdiction for the same crime. *See id.*; *see also Brant*, 62 F.3d at 368.

Pinkins argued at sentencing that the mandatory life sentence for felony murder constituted cruel and unusual punishment in the context of an aiding and abetting theory of guilt, where she not only had no intent to kill, but also did not cause the death herself. We review this constitutional challenge *de novo*. *See United States v. Bowers*, 811 F.3d 412, 430 (11th Cir. 2016). On appeal, Pinkins also challenges the constitutionality of her concurrent life sentence for the § 924(c) violation on the same grounds. As this challenge is unpreserved, we review it only for plain error. *See Suarez*, 893 F.3d at 1335.

Pinkins has not established that her life sentences are grossly disproportionate to the offenses she committed. We acknowledge that a sentence of life without the possibility of parole is the second most severe penalty permitted by law. *See Harmelin v. Michigan*, 501 U.S. 957, 996 (1991). But we must also acknowledge the gravity of her crimes: Two passersby were robbed, and one killed. Moreover, and in any event, we accord "substantial deference" to the

legislative branch's determination of the appropriate sentencing range or a mandatory sentence. *See United States v. Farley*, 607 F.3d 1294, 1343 (11th Cir. 2010); *see also United States v. Moriarty*, 429 F.3d 1012, 1024 (11th Cir. 2005) (explaining that sentences within the statutory range are generally neither cruel nor unusual). The legislature has determined that a life sentence is appropriate for those who commit felony murder and those who cause death with a firearm, and it has chosen not to differentiate between principals and those who are guilty of aiding and abetting. *See* 18 U.S.C. § 2(a) ("Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."). Under the facts of this case, we do not find that this legislative determination results in a sentence that is disproportionate to Pinkins' conduct. Despite Pinkins' characterization of her involvement in Simjee's death as "extraordinarily minimal," the trial court found that she was equally culpable to Hider. Because we find that the punishment fits the crime, we have no occasion to compare Pinkins' sentence with that of other offenders in her jurisdiction. She has not demonstrated that this is one of the "exceedingly rare" instances in which her noncapital sentence is cruel and unusual. *See Solem*, 463 U.S. at 289.

Therefore, whether reviewed under a *de novo* or plain error standard, Pinkins' sentences do not violate the Eighth Amendment.

## III.

For the above reasons, we affirm Pinkins' convictions.

24-10041               Opinion of the Court                    23

**AFFIRMED**.